CAMP MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 155. Promulgated March 14, 1944.

*Robert P. Smith, Esq.*, for the petitioner.
*E. M. Woolf, Esq.*, for the respondent.

## OPINION.

HILL, *Judge*: The first question presented is whether petitioner is entitled to deduct from its 1940 income the sum of $12,463 paid to procure the release of its contingent liability as guarantor on certain preferred stock of another corporation. Respondent disallowed the deduction. Petitioner contends that he did so erroneously.

Petitioner has been in the business of manufacturing lumber and lumber products since 1887. It found it unprofitable to thus process small and low grade trees and impossible to dispose of its waste. Such trees and waste could be used advantageously for pulpwood in the milling of paper, but there were no local paper mills to which petitioner might sell and it had been unable to induce anyone to build a mill in the vicinity. Therefore, to provide a market for these materials, petitioner joined with two others in the financing of a new company, Chesapeake-Camp Corporation, which would erect a paper mill and buy from petitioner the trees and waste which it could not profitably manufacture into lumber. Petitioner subscribed to one-half of the new company's capital stock, at a cost of $1,125,000. However, three weeks later, petitioner deemed it advisable to sell 5,000 shares of the preferred stock so subscribed for in order to replenish its own working capital. To sell this stock it was necessary for petitioner to guarantee, and it did guarantee, the payment of 5 percent cumulative dividends and the redemption of the stock at par in the event of liquidation. The guaranty was printed on the back of the stock certificates, which were thereupon sold to the public through the Investment Corporation of Norfolk. About four years later, petitioner, desirous of relieving itself of the guaranty and having secured the cooperation of Chesapeake-Camp Corporation, offered to exchange a new share of Chesapeake-Camp Corporation's preferred stock without the guaranty plus $5 for each share of guaranteed stock. In 1940 the offer was accepted

by the holders of 2,507 shares. Petitioner paid out $12,463 in connection with the exchanges thus made. This is the payment which petitioner believes it is entitled to deduct from gross income either as a business expense or as a loss.

It is well established that business expenses must be both ordinary and necessary to be deductible under section 23 (a) of the Internal Revenue Code. *Welch* v. *Helvering*, 290 U. S. 111. This is the double test to be applied in determining whether the outlay in question is deductible as a business expense.

Petitioner had the unquestioned right to determine the means of replenishing its working capital and in adopting therefor the plan to sell a portion of the preferred stock purchased from the new company it exercised a judgment to subserve a legitimate business purpose. To effectuate the sale of the stock the obligation of guaranty was necessary. It was therefore a necessary obligation incurred in carrying on petitioner's business. It was also a type of obligation which business concerns under similar circumstances might normally and ordinarily be expected to incur. The guaranty was a continuing obligation so long as the stock to which it was applied was unliquidated. It imposed a continuing potential necessity of performance entailing a potentially heavy financial burden which could not be anticipated or measured in advance.

Whether or not petitioner may have been subrogated to the rights of the holders of the guaranteed stock against the new company in respect of payments which petitioner might be called upon to make under the guaranty, recoupment of such payments would depend upon the problematic financial status of the new company for an indeterminable period of time and the extent, if any, to which recoupment might be realized was at best speculative. Hence, it is apparent that a release from the obligation of guaranty, secured at a reasonable price, would be in keeping with good business practice. Petitioner secured such release in the taxable year by the payment of $12,463 in cancellation of its contract of guaranty in respect of 2,507 shares of stock covered thereby.

Since the obligation of guaranty was a necessary and ordinary obligation incurred by petitioner in carrying on its business, the expense in the amount reasonably necessary to secure a cancellation or release of such guaranty is a necessary and ordinary business expense. Cf. *Robert Gaylord, Inc.*, 41 B. T. A. 1119.

The question of reasonableness of $5 a share as a consideration for release of the guaranty has not been presented, but it appears to us under the facts here that it is not an unreasonable amount therefor. We, therefore, hold that the amount of $12,463 paid out by petitioner in the taxable year for release from the guaranty was a necessary and ordinary business expense and deductible as such.

The above holding renders it unnecessary to consider the alternative contention of petitioner that the outlay in question was a loss deductible under section 23 (f) of the Internal Revenue Code.

We next must determine whether profit from the sale of standing timber in 1940 constituted capital gain, as contended by petitioner, or ordinary gain, as claimed by respondent. The question arises in connection with the ascertainment of petitioner's excess profits net income for the year 1940. Section 711 (a) of the Internal Revenue Code provides that excess profits net income shall be the normal tax income, with certain named adjustments. One such adjustment, applicable to 1940 and to be made where the excess profits credit is computed under the income method, is that "There shall be excluded long-term capital gains and losses. * * *" Sec. 711 (a) (1) (B), Excess Profits Tax Act of 1940. See also Regulations 109, sec. 30.711 (a)–2, giving the Treasury's interpretation of such statute, wherein it is said: "In recomputing normal-tax net income for the purpose of determining the excess-profits net income for the taxable year * * * there shall be excluded long-term capital gains and losses. * * *"

In respect of the taxable year 1940 a "long-term capital gain" was defined as meaning "gain from the sale or exchange of a capital asset held for more than 18 months, if and to the extent such gain is taken into account in computing net income." Sec. 117 (a) (4), Internal Revenue Code. It is stipulated that the standing timber, the sale of which is here involved, was owned and held by petitioner for over two years. Hence, the profit arising from its sale became a long term capital gain if the standing timber was a capital asset. The question is thus narrowed to a determination as to whether it was a capital asset.

The term "capital assets" is defined in section 117 (a) (1) of the Internal Revenue Code.[1] By virtue of such definition the term means property held by the taxpayer, whether or not connected with his trade or business, except that it does not include the taxpayer's stock in trade or other property properly includible in his inventory, property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property used in the trade or business which is subject to depreciation allowance under section 23 (l). Since the standing timber was property held by petitioner, it follows that the trees sold constituted capital assets unless they were property of a character excluded from the concept by one of the exceptions in the definition.

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l).

Identical questions arising from the sale of timber have been previously resolved when tested against the slightly different definitions of "capital assets" contained in prior revenue acts. A case in which the facts closely approach those present here is *Carroll* v. *Commissioner*, 70 Fed. (2d) 806, which affirmed 27 B. T. A. 65 on this point, but reversed it on another. There a partnership, which had always been engaged in the manufacture and sale of lumber at wholesale, made an agreement with a company whereby the latter cut timber on the lands of the partnership, for which it paid $10 per thousand feet. The court held that the timber so sold was a capital asset and, in so doing, said:

* * * The business in which the partnership was engaged was that of manufacturing lumber and selling it at wholesale. Its timber land or standing timber came within each of the above quoted definitions [contained in the Revenue Acts of 1921, 1924 and 1926], and did not come within any exception stated in either of those definitions. It was not part of the business of the partnership to buy and sell or trade in timber land or standing timber. The timber land or standing timber was not included in its stock in trade, would not properly be included in its inventory if on hand at the close of a taxable year, and was not held by it primarily for sale in the course of its trade or business. The timber was part of the partnership's capital assets, as much so as one of its sawmills which might advantageously be disposed of because it had ceased to be profitable or conveniently located. *Doyle* v. *Mitchell Brothers Co.*, 247 U. S. 179, 187, 38 S. Ct. 467, 62 L. Ed. 1054. * * *

By substituting the word "petitioner" for "partnership," the statement becomes peculiarly apropos to the case at bar and, with the additional observation that standing timber is obviously not property of the type subject to depreciation allowance under section 23 (1), should serve to dispose of respondent's contention upon this issue. See also *Estate of M. M. Stark*, 45 B. T. A. 882; *John W. Blodgett*, 13 B. T. A. 1388.

However, some further discussion is, perhaps, warranted in view of respondent's insistence that petitioner's sale of standing timber in years other than the taxable year and its purpose of buying and selling timber as evinced by its charter require a conclusion that the timber was held primarily for sale *to customers* in the *ordinary* course of its trade or business and, hence, must be excluded from the definition of "capital asset" under section 117 (a) (1). The words emphasized above were added to section 117 (a) (1) by the Revenue Act of 1934. It is apparent that their inclusion narrows the scope of the exception as it previously existed. Disregarding for the moment the *Carroll* case, whatever merit there might have been in respondent's contention under the old definition, we think it untenable now.

Petitioner sold an average of $500 worth of standing timber 'per year from 1930 to 1939. In 1940, due largely to the unsolicited orders of two purchasers, the amount sold increased to about $16,000 worth, where it remained in 1941 and 1942. The increase probably resulted from the Government's war demands for piling. In view of other

evidence, such as the fact that over $1,000,000 worth of timber was bought in the same period, the evidence of relatively insignificant sales thereof falls far short of proving that the standing timber was held primarily for sale to customers in the ordinary course of its trade and business. Petitioner had been in the lumber manufacturing business since 1887. Its customers were buyers of lumber and lumber products with whom it dealt over the years, not the unexpected and unsolicited purchasers of a few standing trees. The ordinary course of its trade and business was to process its raw material, the timber, and to sell the finished product, not to buy and sell standing timber. See *United States* v. *Robinson*, 129 Fed. (2d) 297. The fact that petitioner might have engaged in the business of buying and selling timber under its charter is of no moment, since the facts establish that it did not enter this business. *Thompson Lumber Co.*, 43 B. T. A. 726.

The case of *Commissioner* v. *Boeing*, 106 Fed (2d) 1305, upon which respondent largely relies, is not in conflict with our conclusion that petitioner's standing timber was a capital asset. *Carroll* v. *Commissioner*, *supra*, and *John W. Blodgett*, *supra*, are cited and distinguished therein on the ground that, unlike the *Boeing* facts, the contracts between the parties and the logging companies resulted in a sale of the timber to the logging companies. By the same token, the *Boeing* case is distinguishable from the present proceeding, for here too the sales were made to purchasers who cut, removed, and sold the purchased trees for their own account and not as agents of petitioner.

Respondent erred in failing to treat the profit realized by petitioner in 1940 from the sale of standing timber as a capital gain.

*Decision will be entered under Rule 50.*