## WATSON ET AL. *v.* COMMISSIONER OF INTERNAL REVENUE.

No. 290.   Argued February 2, 1953.—Decided May 18, 1953.

*Arthur McGregor* argued the cause for petitioners. With him on the brief was *A. Calder Mackay*.

*Ellis N. Slack* argued the cause for respondent. With him on the brief were *Solicitor General Cummings, Assistant Attorney General Lyon* and *Hilbert P. Zarky*.

*Chester H. Ferguson* and *George W. Ericksen* filed a brief for Edwards et al., as *amici curiae,* supporting petitioners.

Mr. Justice Burton delivered the opinion of the Court.

This case relates to a taxpayer who, for several years, held an undivided interest in an orange grove and engaged in the business of growing and selling the oranges it produced. In the midst of the 1944 growing season, she sold her interest in the grove, including an unmatured crop then on the trees. The question before us is whether, for federal income tax purposes, she must treat that part of her profit from the sale which is attributable to the unmatured crop as ordinary income or as a capital gain. For the reasons hereafter stated, she must treat it as ordinary income.

In 1944, Mrs. M. Gladys Watson, one of the petitioners here, and her two brothers, each owned an undivided one-third interest in a 110-acre navel orange grove near Exeter, Tulare County, California. Its management had been supervised by her brothers since 1912 and, since 1942, she and her brothers had operated it as a partnership. It was the oldest and one of the best groves in the locality. Its production per acre was about twice the average of such production in the county. In each of the last five years the value of its crop had increased over that of the year before. In 1943 it produced 79,851 loose boxes of oranges, yielding a gross income of $136,808.71. After deducting all expenses of cultivation, operation, picking and hauling, a net income of $92,153.05 was left.[1] Anticipating a heavy frost after November,

---

[1] In 1942 it yielded 54,939 boxes with a gross income of $82,521.17 and a net of $49,790.10. Its average annual yield from 1934 to 1943 was 55,097 boxes with a gross income of $46,512.68 and a net of $22,141.42.

1944, one of the brothers advocated selling the grove before then. Accordingly, in May or June, it was offered for $197,100, complete, including land, trees, unmatured crop, improvements, equipment and a five-acre peach orchard. At about that time the 1944 orange crop was in bloom.

By July the smaller fruit had dropped from the trees and the crop was "set," but not assured. A purchaser became interested but delayed his decision so as to determine more accurately the probable crop and to cause the sellers to bear more of the expense of its care. He examined past production records and, by early August, received estimates that the 1944 crop might be from 70,000 to 80,000 boxes, which, at current prices, would bring him $120,000 for the crop above expenses. One of Mrs. Watson's brothers also estimated the 1944 crop at 70,000 boxes if it matured. August 10, the sales price of $197,100 was agreed upon, payable $10,000 in cash and the balance September 1. No allocation of the price between the crop and the rest of the property was specified but the seller bore the expense of caring for the crop up to September 1, amounting to $16,020.54. The sale was carried through and there was no serious frost. The crop filled 74,268 boxes. The purchaser sold them for $146,000, yielding him a net return of $126,000.

Mrs. Watson filed a joint return with her husband, taking full deductions for her·one-third share of all of the business expenses incurred in the cultivation of the crop, but treating her gain from the sale of the grove, including the unmatured crop, as a long-term capital gain. On that basis, her net gain from the sale of the grove was shown as $48,819.82, but, treating it as a long-term capital gain, only 50% of it, or $24,409.91, was included in her taxable income.[2]

---

[2] § 117 (b) and (c)(2), I. R. C., as amended by § 150 (c) of the Revenue Act of 1942, c. 619, 56 Stat. 843–844, 26 U. S. C. (1940 ed., Supp. V) § 117 (b) and (c)(2).

The Commissioner of Internal Revenue assessed a deficiency against petitioners, largely based on his claim that whatever part of Mrs. Watson's income was attributable to the unmatured crop should be treated as ordinary income. He allocated $122,500, out of the $197,100 received for the grove, as attributable to the unmatured crop. On that premise, he assessed a deficiency of $24,101.35 against petitioners on their joint return. On review, the Tax Court, with two judges dissenting, sustained the Commissioner in principle but reduced to $40,000 the portion of the proceeds attributable to the crop. 15 T. C. 800. With other adjustments, not material here, the Tax Court reduced the deficiency to $6,920.35. The Court of Appeals affirmed. 197 F. 2d 56. In the meantime, the Tax Court made comparable decisions in *McCoy* v. *Commissioner,* 15 T. C. 828, and *Owen* v. *Commissioner,* P-H TC Memo, ¶ 50,300, each of which was reversed on appeal, 192 F. 2d 486 (C. A. 10th Cir.), and 192 F. 2d 1006 (C. A. 5th Cir.). Shortly before the latter decisions, the Revenue Act of 1951 amended the statute in relation to taxable years beginning after December 31, 1950, to permit proceeds from certain sales of unharvested crops to be treated as capital gains.[3] We granted certiorari in the instant case to resolve the above-indicated conflict of statutory construction still affecting many sales made before 1951. 344 U. S. 895.

The issue before us turns upon the Acts of Congress. In 1951, Congress, for the first time, dealt expressly and specifically with this subject.[4] While that action was

---

[3] 65 Stat. 500–501, 26 U. S. C. (Supp. V) §§ 117 (j), 24 (f), 113 (b)(1).

[4] The Revenue Act of 1951 added to § 117 (j) of the Internal Revenue Code:

"(3) SALE OF LAND WITH UNHARVESTED CROP.—In the case of an unharvested crop on land used in the trade or business and held

prospective only, its terms throw light on the problems of prior years.[5]  The adoption of that amendment emphasized the point that the question was one of federal law.  Its adoption also recognized that, in order for such income to be a capital gain, an affirmative statement by Congress was needed.  Finally, it not only permitted proceeds of unharvested crops to be treated as capital gains under certain circumstances, but it provided that, under those circumstances, the taxpayer could not deduct from his taxable income the expenses attributable to the production of the unharvested crop.  Those expenses thereafter must be treated as capital investments added to the basis of the property to which they relate.  This emphasizes the impropriety of the interpretation advocated by Mrs. Watson in the instant case.  She seeks to deduct her share of the crop cultivation expenses at 100% up to the date of the sale.  At the same time, she

---

for more than 6 months, if the crop and the land are sold or exchanged (or compulsorily or involuntarily converted as described in paragraph (2)) at the same time and to the same person, the crop shall be considered as 'property used in the trade or business.'"  65 Stat. 500, 26 U. S. C. (Supp. V) § 117 (j)(3).

And, equally important, it added to § 24 of the Internal Revenue Code:

"(f) SALE OF LAND WITH UNHARVESTED CROP.—Where an unharvested crop sold by the taxpayer is considered under the provisions of section 117 (j)(3) as 'property used in the trade or business,' in computing net income no deduction (whether or not for the taxable year of the sale and whether for expenses, depreciation, or otherwise) attributable to the production of such crop shall be allowed." *Id.*, at 501, 26 U. S. C. (Supp. V) § 24 (f).

[5] The purpose of Congress to make this amendment prospective, rather than retroactive, is emphasized in the very next section of the 1951 Act.  That section made retroactive to 1942 another amendment to § 117 (j).  It redefined capital gains so as to include the proceeds of certain sales of livestock, provided such stock be held for draft, breeding or dairy purposes.  Stock so held is comparable to the orange trees rather than to the orange crop in the instant case.

claims a right to report only 50% of her gain on the sale of those crops to which the cultivation expenses relate.[6]

In the instant case, we are dependent upon § 117 (j) of the Internal Revenue Code, as in effect in 1944.[7] The

---

[6] In this connection, the Senate Committee on Finance, when reporting the proposed amendment in 1951, said:

"Your committee believes that sales of land together with growing crops or fruit are not such transactions as occur in the ordinary course of business and should thus result in capital gains rather than in ordinary income. Section 323 of the bill so provides.

"Your committee recognizes, however, that when the taxpayer keeps his accounts and makes his returns on the cash receipts and disbursements basis, the expenses of growing the unharvested crop or the unripe fruit will be deducted in full from ordinary income, while the entire proceeds from the sale of the crop, as such, will be viewed as a capital gain. Actually, of course, the true gain in such cases is the difference between that part of the selling price attributable to the crop or fruit and the expenses attributable to its production. Therefore, your committee's bill provides that no deduction shall be allowed which is attributable to the production of such crops or fruit, but that the deductions so disallowed shall be included in the basis of the property for the purpose of computing the capital gain.

"The provisions of this section are applicable to sales or other dispositions occurring in taxable years beginning after December 31, 1950.

"The revenue loss under this provision is expected to be about $3 million annually." S. Rep. No. 781, 82d Cong., 1st Sess. 47–48.

[7] Internal Revenue Code, as amended, 56 Stat. 846:

"SEC. 117. CAPITAL GAINS AND LOSSES.

.    .    .    .    .    .

"(j) GAINS AND LOSSES . . . FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

"(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.— *"For the purposes of this subsection, the term 'property used in the trade or business' means property* used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, *which is not* (A) property of a kind which would properly be in-

controlling language in that subsection then required that, in order for gains from the sale of property to be treated as capital gains, the property sold must be "used in the trade or business" of the taxpayer, "held for more than 6 months," and *not* "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." In the instant case, the Commissioner contends that, while the land and trees met these and all other tests of the subsection, the unmatured, unharvested crop of oranges met none of the above three.

Each day brought the annual crop closer to its availability for sale in the ordinary course of that business. While the uncertainty of its condition at maturity discounted its current value, nevertheless, its presence contributed substantially to the value of the grove. The Commissioner allocated to the unmatured crop, as of September 1, a value of $122,500 out of the $197,100. The Tax Court reduced this to $40,000. We accept the latter amount now confirmed by the Court of Appeals. It is obvious that the parties to this sale did in fact attribute substantial value to the unmatured crop. If, at any moment, the crop had been stripped from the trees or destroyed by frost, there would have resulted at once a substantial reduction in the sales value of the grove.

---

cludible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) *property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.*

"(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business . . . exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. . . ." (Italics supplied.) See 26 U. S. C. § 117 (j).

Assuming $40,000 to be the value fairly attributable to the presence of the crop in August and September, 1944, it remains for the taxpayer to demonstrate that § 117 (j) has authorized that value, in addition to the value of the land, trees, improvements and equipment, to be treated as a capital gain.

Mrs. Watson and the Courts of Appeals for the Fifth and Tenth Circuits have placed emphasis upon a claim that, under the law of the state where the land is situated, an unmatured, unharvested crop, for many purposes, is treated as real property. We regard that as immaterial. Whether or not the crop be real property, the federal income tax upon the gain resulting from its sale is, in its nature, a subject of federal law.

The Commissioner urges two grounds in support of his position that § 117 (j) does not authorize the taxpayer's treatment of the proceeds of the unmatured crop as a capital gain. The first is that the proceeds fairly attributable to the crop are derived from property held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business. We agree with that contention. Although the property was not severable at the date of its sale, there is nothing in the Act requiring it to be severable. While, in previous years, like crops were held for a sale that occurred after maturity, in 1944 the date of that sale came September 1. There is nothing in the Act that distinguishes between the taxable character of a gain derived from a present sale discounting the hazards of the future, and one derived from a later sale when the hazards are past. After the transfer of title to the grove, the crop on the trees retained its character and continued to be held for sale to customers of the grove owner in the ordinary course of the owner's trade or business.

The Commissioner's treatment of the proceeds of sales of unmatured crops as ordinary income in the absence of

a statutory requirement to the contrary is consistent with
the policy evidenced in *Williams* v. *McGowan,* 152 F. 2d
570, 572, which established in the Second Circuit, in 1945,
the doctrine that "upon the sale of a going business it
[the sales price] is to be comminuted into its fragments,
and these are to be separately matched against the defini-
tion in § 117 (a) (1) . . . ." It is consistent also with
the policy of the Bureau of Internal Revenue and the
Tax Court, dating, at least, from the statement made by
the Bureau in 1946, that, under circumstances comparable
to those before us, "regardless of their stage of develop-
ment, any gain realized from the sale of growing crops is
ordinary income." [8]

We do not have here the situation which arises from
the sale of land, including coal or other mineral wealth
not separated from its natural state and not in the course
of annual growth leading to a seasonal separation. See
*Butler Consolidated Coal Co.* v. *Commissioner,* 6 T. C.
183. The instant case also is distinguishable from that
of growing timber which is not in itself an annual or short-
term product. See *Carroll* v. *Commissioner,* 70 F. 2d

---

[8] "The production of fruit from orchards or groves constitutes a
business, and section 117 (j) of the Code, supra, is applicable to the
sale of an orchard or grove. The crops are produced with the
primary purpose of selling the fruit to customers in the ordinary
course of the business. Therefore, regardless of their stage of devel-
opment, any gain realized from the sale of growing crops is ordinary
income.

"In view of the foregoing, it is held that, for Federal income tax
purposes, where citrus groves are sold with fruit on the trees, a
portion of the selling price must be allocated to the fruit and the
balance to the land and trees. Gain from the sale of the fruit will
constitute ordinary income. Gain from the sale of the land and
trees may be treated as capital gain under section 117 (j) of the
Internal Revenue Code, provided the recognized gains from all trans-
actions coming within the purview of that section exceed the recog-
nized losses thereunder." 1946-2 Cum. Bull. 31.

806; *Camp Manufacturing Co.* v. *Commissioner,* 3 T. C. 467.

Having reached this conclusion, we find it unnecessary to pass upon the Commissioner's second contention that, because the crop did not come into existence before it was "set" in July, or at least before it was in bloom in May or June, it had not been held by Mrs. Watson for more than six months at the time of its sale.

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE MINTON, with whom MR. JUSTICE REED and MR. JUSTICE DOUGLAS join, dissenting from the Court's opinion and judgment.

The question is: Should the sale and conveyance of this land for a lump sum be treated wholly as a sale of real estate taxable as a long-term capital gain, or should the crop of immature oranges be segregated and its value taxed as ordinary income?

The pertinent provisions of the statute are set forth in the margin.[1] Mrs. Watson does not contend that the growing oranges were capital assets as defined in § 117 (a), but instead she claims that they were "property used in the trade or business" as defined in § 117 (j) and that she is entitled to capital gains treatment under that sec-

---

[1] "SEC. 117. CAPITAL GAINS AND LOSSES.

"(a) DEFINITIONS.—As used in this chapter—

"(1) CAPITAL ASSETS.—The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l) . . . or real property

tion. Her claim rests on her contention that the growing oranges were: (1) real property; (2) used in her trade or business; and (3) held for more than 6 months; and that they were neither (4) properly includible in inventory; nor (5) held primarily for sale to customers in the ordinary course of her business.

*First.* The immature oranges were real property when the orange grove was sold. Mrs. Watson and her brothers sold the green oranges as part of the land, without severance, constructive or otherwise. How this transaction should be treated under California law does not necessarily control its treatment taxwise under the federal statute. *Burnet* v. *Harmel,* 287 U. S. 103, 110. However, real property is not defined in the Revenue Act,

used in the trade or business of the taxpayer . . . ." 53 Stat. 50, as amended, 26 U. S. C. § 117 (a)(1).

. . . . .

"(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business.—

"(1) Definition of property used in the trade or business.—

"For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

"(2) General rule.—

"If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business . . . exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. . . ." 56 Stat. 846, 26 U. S. C. § 117 (j).

and in the absence of such definition we must look to the law of California to determine what is real property. Under that law, this crop of oranges passed as real estate. *Wilson* v. *White,* 161 Cal. 453, 460, 119 P. 895, 898; *Young* v. *Bank of California,* 88 Cal. App. 2d 184, 187–188, 198 P. 2d 543, 545–546. The immature fruit, from the falling of the blossoms until the harvesting, is a part of the realty, as its very existence and growth are wholly dependent upon the ground from which it takes its life and gains its sustenance. Actually severed from the ground before maturity, the fruit is worthless. Its life, and hence its value, lies in the soil of which it is a part.

*Second.* The Commissioner urges that, unlike the trees, the oranges are the ultimate product of the enterprise, and as such are not "used" in the business. We do not interpret the word "used" so narrowly. We believe that the phrase "used in the trade or business" is simply designed to differentiate business assets from the taxpayer's personal assets and his nonbusiness, income-producing property. It is not disputed that Mrs. Watson's business was raising and selling oranges nor that the land and orange trees were used in her business. At the time the orange grove was sold, the oranges were as much a part of the trees as the leaves and the bark. Therefore, the oranges were "property used in [Mrs. Watson's] trade or business."

*Third.* Were the oranges "held for more than 6 months" before the sale? It is clear that the land and trees had been held since January 1, 1942, over two and one-half years prior to the sale. As we have just said, the oranges were real property, an integral part of the trees on which they grew. Therefore, the holding period for the oranges is the same as for the trees, and the oranges were "held for more than 6 months" within the meaning of § 117 (j).

*Fourth.* The Bureau itself has said that the growing oranges were not "properly . . . includible in [Mrs.

Watson's] inventory." The Bureau's ruling provides in pertinent part:

> "While farmers may report their gross income upon the accrual basis (in which an inventory to determine profits is used), they are not permitted to inventory growing crops for the reason that the amount and value of such crops on hand at the beginning and end of the taxable year can not be accurately determined. . . ." [2]

*Fifth.* We believe that the growing oranges were not "held . . . primarily for sale to customers in the ordinary course of [Mrs. Watson's] trade or business." What was the business of the taxpayer? She was in the business of raising and selling matured fruit. She was not in the business of selling land and trees and green fruit growing upon the trees. She was going out of the business in which she had long been engaged. She sold everything for one lump sum, without any allocation to land, trees or green fruit. It was not an ordinary business transaction. It was an extraordinary transaction. It was not a sale in the ordinary course of business. It was a sale out of the course of business for the purpose of going out of business. It was not a sale to an ordinary customer, who bought ripe fruit in quantities less than the whole crop, as Mrs. Watson had been accustomed to sell them. It was a sale of land and green fruit to one not a customer. Mrs. Watson did not split the sale up into land, trees, and green fruit. She sold all as one, and at the same time. It is the Commissioner who breaks up her sale into parts and makes something out of it different from what it was, and then proceeds to tax the transaction as he remade it. I have always understood that tax laws deal with realities. It is unrealistic to treat an

---

[2] I–1 Cum. Bull. 72.

extraordinary sale for one consideration of real property, part of which is immature green fruit, which sale will put the seller completely out of business, as an ordinary sale in the course of trade or business, when the business being closed out had been one that dealt only in the sale of matured fruit. The Commissioner is not free to remake the transaction as he sees fit.

The Tenth Circuit and the Fifth Circuit have reached a different conclusion from that of the Tax Court and the Ninth Circuit in the instant case. In *McCoy* v. *Commissioner*, 192 F. 2d 486 (C. A. 10th Cir.), the court was dealing with the sale of land with a growing crop of wheat upon it. In *Owen* v. *Commissioner*, 192 F. 2d 1006 (C. A. 5th Cir.), as in the instant case, the court was dealing with the sale of an orange grove. Moreover, two District Courts have held that the seller of an orange grove is entitled to capital gains treatment of the value of the immature oranges. *Cole* v. *Smyth*, 96 F. Supp. 745; *Irrgang* v. *Fahs*, 94 F. Supp. 206. I agree with these courts that the oranges in the instant case were "property used in [Mrs. Watson's] trade or business" as defined by the Revenue Act. The sale of the orange grove was not to be broken up to enable the Commissioner to tax as personalty that which was real property. The immature crop of green oranges was not property held primarily for sale to customers in the ordinary course of trade or business.

In amending the Revenue Act of 1951, Congress took cognizance of the construction placed on § 117 (j)(1) by the Commissioner and the Tax Court, and amended the section to make it abundantly clear that unharvested crops were a part of the realty upon which they were growing and were to be given capital gains treatment. 65 Stat. 500, 26 U. S. C. (Supp. V) § 117 (j)(3).

After discussing the conflict that had arisen over the Commissioner's interpretation of the statute as to grow-

ing immature crops, the Senate Committee Report on this Amendment states:

> "Your committee believes that sales of land together with growing crops or fruit are not such transactions as occur in the ordinary course of business and should thus result in capital gains rather than in ordinary income. . . ." [3]

Congress was correcting a misinterpretation of the Revenue Act by the Commissioner and the Tax Court. It was making clear what the Commissioner and the Tax Court had obfuscated. I see no reason why we should strain to uphold a tax which Congress has by recent legislation determined to be incorrect.

I would reverse the judgment.

---

[3] S. Rep. No. 781, 82d Cong., 1st Sess. 47.