William F. SULLIVAN and Rosemary
C. Sullivan

v.

UNITED STATES of America.

Civ. A. No. 76–425.

United States District Court,
W. D. Pennsylvania.

Nov. 30, 1978.

Charles Weiss, Pittsburgh, Pa., for plaintiffs.

Thomas A. Daley, Asst. U. S. Atty., Pittsburgh, Pa., J. Brian Ferrell, Tax. Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

KNOX, District Judge.

The court is faced after a nonjury trial upon the merits with resolution of another facet of the ever recurrent contest between the government and the taxpayers with respect to long term or short term capital gains. The suit is concerned with the question of sale of land for a shopping center known as Eastland Shopping Center developed by the husband plaintiff William F. Sullivan.[1]

---

1. Wife plaintiff, Rosemary C. Sullivan, is involved as a party in this litigation apparently because joint returns were filed for the year in question. It does not appear she played any active part in the negotiations or preparations of the return.

The case also represents to a minor degree the various vagaries and idiosyncracies of the federal income tax system which attempts on the one hand to insure that persons actually engaged in the sale and development of real estate subdivisions and projects shall not escape a short term gain tax at ordinary income tax rates as other persons and on the other hand to protect the long term investor who does invest his money for a long term in developing a truly capital asset. We are concerned here with the year 1962 and hence are not involved with the 1976 Tax Reform Act. During the period in question, the law was that gains derived from sale of short term capital assets, that is, assets held for less than six months should be taxed at full and ordinary rates while profits derived from sales of long term capital assets, that is, assets held over six months, should be taxed at only fifty percent.

Particularly we are concerned with Section 1221 of the Internal Revenue Code of 1954 (26 U.S.C. § 1221) which defines capital assets as property held by a taxpayer whether or not connected with his trade or business with certain exceptions. The exceptions with which we are primarily concerned in this case are Section 1221(1) covering property held by a taxpayer primarily for sale to customers in the ordinary course of his trade or business and Section 1221(3)(A) covering copyrights or literary musical or artistic compositions held by a taxpayer whose personal efforts created such property. The sale of such assets was considered as ordinary gain or ordinary income by the tax gatherers. Other assets such as stocks, bonds, and investments in real property were considered as capital assets subject to the long term gain provisions of the Act. As is pointed out by the plaintiff it would appear that 1221(3) in his legislative history shows that it was intended to be limited to books or artistic works. See *C.I.R. v. Ferrer*, 304 F.2d 125 (2d Cir. 1962). A leasehold on the other hand is considered as qualifying as a capital asset.

*Commissioner v. Golonsky*, 200 F.2d 72 (3d Cir. 1952).

The facts are relatively simple. Mr. Sullivan bought the land in question on December 26, 1952. Beginning in the late 1950s he began to conceive of and work upon the project of putting together a large shopping center on the land and for this purpose he accumulated key leases such as those from Gimbels, J. C. Penney Company, Sears, Roebuck and Company, and other large merchandisers. On August 31, 1962, he sold the property. (See taxpayer's Ex. N) to a group of investors represented by Mr. Samuel Hyman. The property is located in North Versailles Township, Allegheny County, Pennsylvania.

While it appears that the basic terms of the sale had been agreed upon between the parties on or about July 3, 1962, nevertheless the transaction was not finalized until August 31, 1962, when the deed was given by plaintiffs and a separate corporation East Arlington, Inc. owning a minor interest which had no particular significance in the transaction. The deed conveyed to one Rose Kaufmann, et al property in North Versailles Township including the shopping center and "all improvements, privileges, hereditaments and appurtenances whatsoever thereunto belonging or in anywise appertaining, and the reversions and remainders, rents, issues and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever . . . (of first parties)." This it will be observed is a deed for the fee and carries with it transfer of all the rents, issues and profits arising out of the real estate in question. The separate consideration for the deed was $250,000.

Meanwhile, other developments had occurred with respect to the leases on the property including a separate agreement with Gimbel Brothers as to operation of their store on the premises. The plaintiff William F. Sullivan had beginning in the year 1961, begun to assemble other lessees who had agreed to open stores on the prem-

ises. Their leases are set forth in pretrial stipulation No. 8.[2]

If these leases had simply been assigned at the time of the giving of the deed and had there been no separate agreement or consideration with respect to them, this lawsuit probably never would have arisen. However, on August 31, 1962, by separate assignments, the Sullivans transferred their interests in the above leases for a total *separate* consideration of $1,250,000 and this transfer creates the problem with which we are concerned.

We find that up until the time of the sale in August, 1962 there had been no development of the property and though there had been some clearing and some foundation work but nothing in the nature of a building had been erected on the premises. This distinguishes the case from *Paul v. Commissioner of Internal Revenue,* 206 F.2d 763 (3d Cir. 1953) where a building had been partly erected more than six months before the sale and left uncompleted and thereafter was completed. It was held by the court that the taxpayer was entitled to a long term gain treatment on the building as it stood prior to the beginning of the six month period.

The court finds that while the plaintiffs Sullivan were engaged in the buying and selling of real estate they were not engaged in the development of shopping centers as such and it is specifically found and not seriously contested by the government that property was not being held for sale in the ordinary course of business. It rather was being held by the taxpayers as an investment. It appears that the reason for Sullivan deciding to sell was that he had run into considerable zoning problems, financial problems and problems pertaining to traffic congestion in the area. He however did not attempt to approach Mr. Hyman to sell the property but was approached by Hyman.

We further find as conceded by the government that on February 15, 1972, plaintiffs paid a total deficiency tax which had been asserted by the government in the amount of $293,904.60. Refund claims were thereafter duly filed by the taxpayers and it is admitted by the government that this suit for refund has been timely filed.

Our conclusion that Mr. Sullivan was not holding the property primarily for sale to customers and hence that the profits do not amount generally to a short term gain is based upon the decision of the U.S. Supreme Court in *Malat v. Riddell,* 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966) wherein the court held that consideration

2.

| TENANT | DATE OF AGREEMENT | TERM (Yrs.) | AREA (SQ. FT.) | MINIMUM ANNUAL RENT | MINIMUM GROSS RENT |
|---|---|---|---|---|---|
| Thorofare Markets, Inc. | 12/14/60 | 20 | 24,000 | $ 48,000 | $ 960,000 |
| Gimbel Bros, Inc. | 1961 | 25 | 140,000 | | |
| F. W. Woolworth Co. | 7/11/61 | 20 | 45,000 | 112,500 | 2,250,000 |
| J. C. Penney Co. | 8/22/61 | 20 | 106,000 | 127,200 | 2,544,000 |
| Edison Pa. Stores, Inc. | 9/ 1/61 | 20 | 5,600 | 18,000 | 360,000 |
| Standard Sportswear, Inc. | 9/ 7/61 | 20 | 2,400 | 9,600 | 192,000 |
| Oak-G. B. Kinney Co., Inc. | 10/18/61 | 20 | 4,200 | 16,800 | 336,000 |
| Sun Drug Company, Inc. | 10/27/61 | 20 | 9,000 | 21,600 | 432,000 |
| Loblaw, Inc. | 11/10/61 | 20 | 18,000 | 37,800 | 756,000 |
| E. G. Shinner & Co., Inc. | 2/15/62 | 15 | 2,160 | 5,480 | 97,200 |
| Wohl Shoe Company | 2/16/62 | 20 | 1,800 | 12,000 | 240,000 |
| I. M. Jaffe and Sons McKeesport Blvd. Thom McCann, Inc. | 2/26/62 4/20/62 | 10 20 | 3,600 4,500 | 7,500 15,000 | 75,000 300,000 |
| Wohlfarth Bakery, Inc. | 6/10/62 | 15 | 900 | 4,800 | 72,000 |
| DeRoy Bros., Inc. | 6/12/62 | 10 | 2,400 | 9,600 | 96,000 |
| Keystone Flagg Bros., Inc. | 7/ 9/62 | 20 | 1,800 | 8,400 | 168,000 |

should be given to the fact that the word in the statute is "primarily" and this means that the property owner must have a principal purpose in his mind of sale to customers and not the holding as an investment.

■ Before we proceed further, the court should note that the government has previously contended in this case that the suit is barred by a document allegedly executed by the taxpayer at the time of a conference with the appellate division of the Internal Revenue Service. The government claims that this document Form 870AD (modified) contained language whereby the taxpayers agreed to pay a sum certain in settlement of their tax liability and further agreed that they would not sue for a refund. This court, after hearing the evidence on this matter preliminarily and considering arguments on plaintiff's motion to strike the testimony, has ruled that the plaintiff's motion should be granted, that the existence of the document has not been shown nor has its loss been accounted for and therefore we are not considering any such agreement covering payment of taxes for the calendar year 1962. See memorandum dated August 1, 1978.

■ The court further recognizes that the taxpayer has the burden of demonstrating that the determination by the tax authorities is incorrect. *Paul v. Commonwealth*, supra. *Psaty v. U. S.*, 442 F.2d 1154 (3d Cir. 1971).

There can be no question that if the taxpayer had on August 31, 1962, sold their entire interest in the Eastland Shopping Center property including land, money invested in clearance, grading, and including all leases under the heading of rents, issues and profits for the total sum of $1,500,000, he would be entitled to a long term capital gain. See Tax Management Portfolio 47–2d, Real Estate Leases and Improvements p. A–11 cited by plaintiffs at p. 14 of their brief as follows:

"The value of a leasehold acquired by a lessor is not itself an asset which may be amortized by the lessor. The rationale of this rule is that the value of the lease is an indivisible and intrinsic aspect of the fee itself. Since the fee is not a wasting asset subject to depreciation, a segment thereof cannot be amortized. The value of the fee may be said to be comprised of the value of the right to rent (or occupy) the property in perpetuity."

To the same effect is *Midler Court Realty Inc. v. Commissioner of Internal Revenue*, 521 F.2d 767 (3d Cir. 1975) where it was held that you cannot separate a so called premium rent from the other rents due on the property. The court held that regardless of what it was called the payments were still rent and that the existence of any such premium rent is inherently suspect in an arms length transaction. The court said:

"We are unwilling to burden the tax collection process with speculative inquiries into the relative fortunes of lessors and lessees at the bargaining table."

■■ We must remember the fee in real estate is the total bundle of rights held by the owner with respect to the land. *Rothensies v. Fidelity Philadelphia Trust Co.*, 112 F.2d 758 (3d Cir. 1940). The purchaser of the fee gets the leases and rents arising from the property whether specified or not. It is of course possible to break up this bundle of rights into innumerable other bundles such as the land, the buildings erected on the land, easements under, on or over the same, and numerous leases and subleases. There should be no obstacle to separating the right to receive rents from the ownership of the land so that one party owns all the leases covering the land without owning any of the land if that is clearly specified. Such a situation raises various practical obstacles but there is nothing theoretically which cannot be done in this respect.

■ There is no doubt that leasehold interests qualify as capital assets. *Commonwealth v. Golonsky*, supra.

What we run into here is another rule of law that where the parties have cast a transaction in a certain form, they will be held to it. See *Paul v. Commissioner*, 206 F.2d 763 (3d Cir. 1953) and *C.I.R. v. Danielson*, 378 F.2d 771 (3d Cir. 1967).

In the latter case the court said:
"Indeed, the presumed tax consequences of the transaction may, as here, help to determine the total amount a purchaser is willing to pay for such a purchase. Therefore, to permit a party to an agreement fixing an explicit amount for the covenant not to compete to attack that provision for tax purposes, absent proof of the type which would negate it in an action between the parties, would be in effect to grant, at the instance of a party, a unilateral reformation of the contract with a resulting unjust enrichment. If allowed, such an attack would encourage parties unjustifiably to risk litigation after consummation of a transaction in order to avoid the tax consequences of their agreements. And to go behind the agreement at the behest of a party may also permit a party to an admittedly valid agreement to use the tax laws to obtain relief from an unfavorable agreement.

"Of vital importance, such attacks would nullify the reasonably predictable tax consequences of the agreement to the other party thereto. Here the buyer would be forced to defend the agreement in order to amortize the amount allocated to the covenant. If unsuccessful, the buyer would lose a tax advantage it had paid the selling-taxpayers to acquire. In the future buyers would be unwilling to pay sellers for tax savings so unlikely to materialize.

"Finally, this type of attack would cause the Commissioner considerable problems in the collection of taxes. The Commissioner would not be able to accept taxpayers' agreements at face value. He would be confronted with the necessity for litigation against both buyer and seller in order to collect taxes properly due. This is so because when the Commissioner tries to collect taxes from one party he may, as here, dispute the economic reality of his agreement. When the Commissioner turns to the other party, there will likely be the arguments that the first party, as here, received consideration for bearing the tax burden resulting from the sale and that the covenants did indeed have economic reality."

■ The fact is that the vendees (with the acquiescence of the vendors)[3] for their own reasons, whatever they may have been chose to split this transaction up. so that while the total price remained $1,500,000 the amount allocated to the land itself was only $250,000 and the balance $1,250,000 was allocated to the leases which the vendees might amortize or utilize for other treatment which might be of tax benefit to them. If the land had been transferred by deed and thereafter separate assignment of leases had been executed, the transaction would remain unaffected since this is the ordinary method in which a real estate transaction is closed with the total price as the sale price for long term gain. There is usually an assignment on each lease or a blanket assignment as here of all leases covering the property. Such assignments are merely confirmatory of the right of the vendee to receive the rents, issues and profits of the property to which he would be entitled in any event. Here, however, the total price was split between land and leases and this is what raises the question of short term gains on some leases.

It is true that the cases cited by the government involve covenants not to compete where the question of ordinary income as part of the sale price is involved but there is no reason why the same principle should not apply to taking assignment of leases separate from the title to the fee.

The government determined that 35 percent of the amount allocated to the leases should be treated as a short term gain and the balance as a long term gain. In view of doubts as to values of the separate leases, we cannot say this is error. The taxpayers have not borne their burden of showing that the government is wrong in this respect. While this does not necessarily ac-

---

**3.** The evidence indicates the split was at the request of the vendee. There were two separate assignments of leases, one dated July 19, 1962 (P Ex. A) and the other dated August 31, 1962, covering somewhat different lists of leases. This does not affect the outcome of this case.

cord with the Pennsylvania law of real estate, when the lease is part of the fee, this does not affect our problem because we are here concerned with federal taxes. See *Watson v. C.I.R.*, 345 U.S. 544, 73 S.Ct. 848, 97 L.Ed.2d 1232 (1953) pertaining to heating a crop of growing oranges as separate from the land.

Under such circumstances an appropriate order must be entered in favor of the government.

The foregoing contains the findings of fact and conclusions of law as required by Rule 52.