STANDARD OIL COMPANY OF NEW JERSEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7512.   Promulgated November 29, 1948.

*Marion N. Fisher*, Esq., *D. Nelson Adams*, Esq., *Maxwell E. McDowell*, Esq., and *George S. Koch*, Esq., for the petitioner.
*Henry C. Clark*, Esq., for the respondent.

846

848

**SUPPLEMENTAL OPINION.**

BLACK, *Judge*: As stated in our earlier report (7 T. C. 1310) petitioner contends that it is entitled to deduct the entire amount of $764,914.24, either as a business expense or as a loss. The respondent contends primarily that no part of the payment of $764,914.24 is so deductible, and in the alternative that, if any amount is deductible, the amount deductible can not be in excess of $350,139.21. This alternative contention is based upon the further contention that the $6,799,446.67 distributed by Anglo out of its earned surplus on hand on December 31, 1929, was available to Export for the payment of dividends, whereas petitioner contends that the $6,799,446.67 was a return of capital to Export and was not available to Export for the payment of dividends.

In our earlier report we held that petitioner had a right under an implied agreement on the part of Export to reimbursement from Export for any amount it was called upon to pay under its contract of guaranty dated November 6, 1929, and that, in the absence of any evidence that such claim for reimbursement was worthless in 1936, petitioner was not in any event entitled to any deduction for the year 1936. In this holding we said:

It seems to us that the only way that petitioner would be entitled to a deduction for the $764,914.24 which it paid in the taxable year on account of its guaranty of dividends on Export's preferred stock would be to show that Export

was insolvent and petitioner's claim for reimbursement was worthless. Petitioner makes no claim that it could make such a showing. At the time of the dissolution of Export in 1936 it owned all the stock of Anglo, which it carried on its books at a cost of more than $73,000,000, and was clearly solvent. That the guarantors, including petitioner, made no effort to be reimbursed can not, as we have already said, give them the benefit of the deduction which they claim.

Basically, we think what we said above was entirely correct in the light of the record which we then had before us, and we adhere to it. However, the word "insolvent" as used above was not very accurately used. It was plain then, and it is still plain, that Export at the time of its liquidation was "solvent" as that term is ordinarily understood. It would have been more accurate if the word "insolvent" had not been used and the opening sentence of the above quoted paragraph had read something like this: "It seems to us that the only way that petitioner would be entitled to a deduction for the $764,914.24 which it paid in the taxable year on account of its guaranty of dividends on Export's preferred stock would be to show that Export did not have sufficient assets to pay its creditors and to discharge its obligation to its preferred stockholders to pay them $100 per share upon liquidation, and, therefore, petitioner's claim for reimbursement was worthless." The reason why such latter statement would have been more accurate than the one which we did use will appear from later discussion in this supplemental opinion. Under the holding which we made in our former report it was not necessary to decide what would be the situation if petitioner's claim for reimbursement was in fact worthless in 1936; namely, whether in that event petitioner would be entitled to any deduction, and, if so, the amount thereof.

At the rehearing a considerable amount of evidence was received. Without discussing the evidence in detail, we think petitioner has definitely proved that any claim it had against Export for reimbursement was worthless in 1936. We shall now consider that matter.

It was decided early in 1936 that Export should be liquidated. Its operations had not been successful. Its earnings were insufficient to pay the 5 per cent dividend on its preferred stock and as a result the guarantors of the stock, of whom petitioner was one, were called upon to pay by far the greater part of the dividends that were paid. It looked as if this situation would continue indefinitely and the burden was onerous, so it was decided to liquidate. At that time Export's balance sheet (set out in our findings) indicated that it had assets, exclusive of the Anglo stock, of only $131,197.61 to meet $191,753.47 of liabilities, exclusive of any liability to the guarantors for past payments by the guarantors. It had a net deficit of $2,965,049.97. This left on the asset side of the balance sheet Export's investment in the Anglo stock, which it was carrying at a cost of $73,589,105.89, and, on the liability side, the two issues of its stock, namely, preferred

$76,493,500 and common $100.   Any claim that petitioner might have against Export for reimbursement of past or future payments was subordinate to the rights of the preferred stockholders, for it is well settled that as a matter of law a surety may not assert his rights to the prejudice of the party whose protection he has guaranteed.   See *Jenkins* v. *National Surety Co.*, 277 U. S. 258; *American Surety Co.* v. *Westinghouse Electric Mfg. Co.*, 296 U. S. 133; *Pou* v. *South Carolina Warehousing Corporation*, 27 Fed. (2d) 418.   Petitioner's claim for reimbursement could not, therefore, have been enforced against the assets of Export until the rights of the preferred stockholders had been satisfied in full.   It would, therefore, have been necessary for Export to sell the Anglo stock for more than the par value of Export's preferred stock ($76,493,500) if petitioner were to realize anything on any claim it had or might have against Export.   We have found as a fact, however, that the fair market value of the Anglo stock on June 30, 1936, was not in excess of $55,000,000.   The greater part of the evidence offered at the rehearing was towards proving the fair market value of the Anglo stock.   The book value of the stock on June 30, 1936, was $44,609,226.44.

Brian D. Beestom, a witness for petitioner, stated that in his opinion the value would not exceed $52,643,318.   Beestom is a fellow of the Institute of Chartered Accountants and a partner of Broads, Paterson & Co. of London, England.   He based his valuation substantially on the following factors:

|  | 1933 | 1934 | 1935 |
|---|---|---|---|
| Adjusted profits of Anglo_____ | £910, 315 | £595, 585 | £977, 603 |
| Add: Debenture interest as this would not occur after 1935_____ | 83, 046 | 72,430 | 26, 347 |
|  | 993, 361 | 668, 015 | 1, 003, 950 |
| Deduct: Abnormal profit on Dollar Exchange_____ | 735,000 | ---------- | ------------ |
| Adjusted profits of Anglo_____ | £258, 361 | £668, 015 | £1, 003, 950 |

| | |
|---|---|
| Average adjusted profits of Anglo for 3 years_____ | £643, 442 |
| Estimated future maintainable revenue per annum_____ | £675, 000 |
| 7% on average capital stock of Anglo outstanding during 1933 to 1935, inclusive [Beestom took 7% of £4,274,111 or £299,188, which he increased to an even £300,000.   He made a slight error on the average capital stock which was £4,401,410 instead of £4,274,111, but this error may be passed.]_____ | £300, 000 |
| Maximum value per £1 share: £675,000 divided by £300,000 which is_____ | £2–5–0 |
| Maximum value for 4,665,410 shares: 4,665,410 times £2–5–0_____ | £10, 497, 172 |
| Converted into American dollars at $5.015_____ | $52, 643, 318 |

Perry E. Hall, a witness for petitioner, stated that in his opinion the top price would not be in excess of $45,000,000. Hall is a partner in the investment banking firm of Morgan Stanley & Co. of New York City, with wide experience in marketing securities over a period of many years. He entertained serious doubt as to whether the stock could have been marketed at any fair price in the United States. In arriving at the top price of $45,000,000, he took into consideration such factors as the wide fluctuation in Anglo's earnings from 1920, the heavy losses sustained in 1931 and 1932, the fact that the company was a foreign corporation, and the fact that the company was exclusively a marketing and distributing company. These factors, as well as others, made it impossible in his opinion to place Anglo in the same category with such American companies as were reflected in the Dow-Jones group of 50 companies representing a cross section of our industrial economy. As of June 30, 1936, these stocks were selling at an average ratio of 15 times the then estimated 1936 earnings. The average of the ratios of prices to earnings for the years 1934, 1935, and 1936 was 18.6, and for the year 1936 it was 18. Using these averages by way of comparison, and recognizing the competitive disadvantage of Anglo stock as against seasoned, high grade American securities, the very highest ratio that Hall felt it possible to give to Anglo was 12 times earnings. Indeed, he considered even this, if anything, too high, and had he not been arriving at an outside figure he would have used a ratio of not more than 10 times earnings. Before applying this ratio to Anglo's adjusted earnings, Hall had to make one adjustment in Beestom's final figures. Beestom added back British income taxes and allowed a reserve for such taxes in arriving at his rate of 7 per cent, whereas the ratio of price times earnings is based upon net earnings *after* taxes. Anglo's adjusted net earnings or (losses) after taxes over the period in question were as follows:

| | | | |
|---|---|---|---|
| 1929 | $6,710,973 | 1933 | $984,254 |
| 1930 | 3,710,794 | 1934 | 2,960,590 |
| 1931 loss | (6,118,486) | 1935 | 3,646,206 |
| 1932 loss | (6,970,740) | 1936 (1st 6 mos.) | 2,225,045 |

In applying the ratio to Anglo's earnings Hall used an even more favorable base than Beestom did. For he took the earnings of 1934 and 1935 and doubled the earnings for the first six months of 1936, even though the latter would not have been in fact available in the spring of 1936 and even though the earnings for the full year 1936 were actually less than double the earnings for the first six months. This gave him the figure of $44,227,548 which he rounded out at $45,000,000.

So long as Anglo's stock was worth less than the par value of Export's preferred stock, the exact fair market value thereof at the end of 1935 or at June 30, 1936, is not of great importance in this case. We have found the fair market value to be not in excess of $55,000,000, which is based upon a consideration of all the evidence and a statement in petitioner's reply brief that "Export's assets were worth no more than approximately $55,000,000 *at the outside*, as the proof clearly shows."

It is thus apparent that, if Export had been liquidated without any assistance from Standard Oil Co., petitioner would not have realized anything on any claim it had against Export, but would have had to pay, in addition to what it paid as a guarantor of dividends, 40 per cent of the difference between $76,493,500 and $55,000,000, or about $8,597,400 more as one of the guarantors of the par value of the preferred stock on liquidation. But the liquidation of Export was not carried out without assistance from Standard Oil Co.

The parties have stipulated in the supplementary stipulation that on May 19, 1936, the Standard Oil Co. acquired from the petitioner, the Standard Oil Co. of Louisiana, and the Carter Oil Co. all of their common stock in Export, "with the understanding of all parties" that Standard Oil Co. "would proceed as expeditiously as possible (a) to furnish Export Corporation with funds to retire Export Corporation's preferred stock and (b) to liquidate Export Corporation and distribute to Standard Oil Company *all of its assets*. Pursuant to this understanding Standard Oil Company on or about June 5, 1936 turned over to Export Corporation $84,142,850.00 which was used by Export Corporation on June 30, 1936 to redeem its preferred stock and thereafter Export Corporation was liquidated *and its assets distributed* to Standard Oil Company." (Italics supplied.)

The respondent now contends that, since Standard Oil Co. furnished Export with sufficient funds to redeem its preferred stock at $110, this left the assets of Export (principally the Anglo stock) free to be used to pay petitioner any claim petitioner might have against Export for payments it had made or would make as one of the guarantors of dividends. We regard such a contention as being directly contrary to the facts as above stipulated. The parties all agree that Standard Oil Co. was to get all of the assets of Export in liquidation if it acquired all of Export's common stock and furnished Export with $84,142,850 for use in redeeming Export's preferred stock. It is quite obvious that such an agreement was greatly beneficial to petitioner, for it relieved petitioner of its guaranty as to dividends after June 30, 1936, and the par value of the preferred stock on any subsequent

liquidation. It is true that petitioner was still called upon to pay its 40 per cent of the final dividend due for the six-month period ended June 30, 1936, but this was the end of its liability as a guarantor. Humble Oil & Refining Co., not a wholly owned subsidiary of Standard Oil Co., had paid the latter on December 26, 1934, $3,600,000 for the undertaking by Standard to pay any and all payments thereafter required of Humble under its guaranty of November 6, 1929. This is a forcible reminder of the burden of the guaranty contract. This obligation was as definitely to be considered in determining whether Export had assets sufficient with which to pay all of its liabilities as any other debt it owed, when it comes to the question of the right of guarantors to be reimbursed for what they had paid out under their guaranty contract. That fact was made plain by the court in *Pou* v. *South Carolina Warehousing Corporation, supra.* The court in that case said:

But so far as the present question is concerned, the fact that the preferred stockholders are postponed to the bondholders and other creditors, and are merely entitled to a preference as against the common stock, can make no difference in the question now presented as between the Association and the preferred stockholders. What is due the preferred stockholders by the Corporation is a liability of the Corporation, and that liability has been guaranteed by the Association, and, no matter whether it is called a debt, obligation, or liability, or whether the preferred stockholders are called stockholders, instead of creditors, can make no difference. The liability is there, in favor of the preferred stockholders. The Association has guaranteed that liability, and it cannot in equity be allowed to compete with the preferred stockholders until their claims have been paid in full.

Respondent in his brief lays much stress on the meaning of the word "insolvent," quoting a concise definition from *Cunningham* v. *Norton*, 125 U. S. 77: "* * * When a person is unable to pay his debts he is understood to be insolvent. It is difficult to give a more accurate definition of insolvency. * * *" Respondent then argues that it was clear that Export could have sold all of its assets, including its holdings of Anglo stock, for enough money to have paid all of its debts, including whatever it owed its guarantors for what they had paid under their guaranty contracts, and would still have had money left. But in making this argument respondent seems to overlook that Export had another obligation to which it was definitely committed, and that was to pay its preferred stockholders $100 per share upon liquidation of the corporation. That obligation amounted to more than $76,000,000. Under these circumstances it seems plain that any claim which petitioner had against Export for reimbursement for payments made under its guaranty was worthless.

Having found that any claim petitioner had against Export for

reimbursement was worthless in 1936, we turn now to the question of what amount is deductible by petitioner.

Petitioner, in its brief filed after the original hearing, in contending that it was entitled to a deduction either as a business expense or as a loss, relied principally upon *Camp Manufacturing Co.*, 3 T. C. 467. In our report promulgated December 10, 1946, 7 T. C. 1310, 1323–1324, we distinguished that case upon its facts and said "There was involved in the *Camp* case no question of a right to reimbursement of the sum paid by Camp." In view of our present holding that any claim petitioner had against Export for reimbursement was worthless in 1936, our ground for previously distinguishing the *Camp* case from the instant case disappears for all material purposes. The payment in the *Camp* case, as we said in our report promulgated December 10, 1946, p. 1324, "was the payment of an original undertaking made solely for Camp's benefit, and after making the payment Camp had no right to reimbursement from anyone, either express or implied." In the instant proceeding the origin and nature of the guaranty agreement of November 6, 1929, shows that it was entered into by petitioner as an essential, direct, and intimate part of its sales of petroleum products to Anglo. Petitioner considered it was necessary, and, as we said in the *Camp* case, it was "a type of obligation which business concerns under similar circumstances might normally and ordinarily be expected to incur." We think that the protection and development of sales in the instant case is as much a business purpose as was the obtaining of working capital in the *Camp* case. We hold, therefore, that, since any claim petitioner might have against Export was worthless in 1936, petitioner is entitled to deduct in the taxable year 1936, either as an ordinary and necessary expense or as a loss, any payment made in 1936 for the dividends due in 1936 for which petitioner was liable under the guaranty contract of November 6, 1929.

We now consider the extent of petitioner's liability under the guaranty contract. Petitioner contends it was liable for the full amount of $764,914.24 which it actually paid. The respondent, on the other hand, contends that on December 31, 1935, Export had on hand a surplus of $115,233.29 which was available for the payment of dividends, to which should be added the earnings of Export for the first six months of 1936 of $921,704.29, thus giving a total of $1,036,937.58 available for the payment of the final dividend of $1,912,285.60; that the guarantors were liable for only the difference between $1,912,-285.60 and $1,036,937.58 or $875,348.02; and that petitioner was liable for only 40 per cent of this difference, or $350,139.21.

The respondent arrives at the surplus on hand on December 31,

1935, of $115,233.29 by treating the $6,799,446.67 of dividends Export received from Anglo which Anglo had paid out of its surplus on hand at December 31, 1929, as being available to Export for the payment of dividends. Petitioner contends that this $6,799,446.67 was a partial return to Export of its investment in the capital stock of Anglo; that it was not available to Export for the payment of dividends as far as the guaranty contracts were concerned; and that, instead of a surplus on hand on December 31, 1935, Export had a large deficit, which deficit was decreased by the earnings of Export for the first six months of 1936, and the balance of the deficit was then made good by the guarantors in 1936 at the time they paid the final dividend due on Export's preferred stock of $1,912,285.60. Petitioner correctly concedes that any distribution by Export to its stockholders of any part of the $6,799,446.67 would be taxable as a dividend to the recipient. *Coudon v. Tait,* 56 Fed. (2d) 208; affd., 61 Fed. (2d) 904; certiorari denied, 289 U. S. 773. But petitioner contends that, for the purpose only of determining the liability of the guarantors under their contracts of guaranty, the $6,799,446.67 should not be treated as income to Export, but as a return of capital, to be credited by Export against its investment in the stock of Anglo. Both Export and the guarantors agreed that the $6,799,446.67 should be so treated under their contracts and in accordance therewith the guarantors have actually paid Export under their guaranty contracts the total amount of $21,271,525.37, whereas, if under the guaranty contracts the $6,799,446.67 had been treated as income to Export rather than a return of capital, the guarantors would have paid that much less on their contracts of guaranty. The manner in which the guarantors and Export have treated the $6,799,446.67 seems to be supported by the principles of accounting. Montgomery, in volume 1, p. 348, of Auditing, Theory and Practice, says:

> Dividends paid by Subsidiaries to Holding Company.—Holding companies frequently purchase the stocks of subsidiaries and pay considerable premiums above par. In nearly all such cases the subsidiaries have large surplus accounts. The payment of dividends out of such surplus is not income to the holding company, because the dividends merely offset in whole or in part the premiums paid for the stock. For this reason alone, surplus at date of acquisition and subsequently earned surplus should be segregated. All dividends out of "prior" surplus, when received, should be credited to the holding company's investment account.

We hold that for the purpose only of determining the liability of the guarantors under their contracts of guaranty the $6,799,446.67 should not be treated as income to Export, but as a return of capital,

to be credited by Export against its investment in the stock of Anglo.[1] It follows, therefore, that on December 31, 1935, Export did not have on hand a surplus of $115,233.29 which was available for the payment of dividends so far as the guaranty contracts were concerned. Instead, it had a capital deficit of $2,941,465.43, which, after applying against it the capital surplus of $1,755.63 and the $2,284,557.85 contributed by the guarantors in 1936 which is not here involved, left a capital deficit of $655,151.95. It thus remains to be determined whether the earnings for the first six months of 1936 of $921,704.29 were available for the payment of dividends so far as the guaranty contracts were concerned. The Delaware corporation law, as it existed in 1936 (Revised Code of Delaware 1935), provided in section 2066:

SEC. 34. Dividends; Reserves.—The directors of every corporation created under this Chapter, subject to any restrictions contained in its Certificate of Incorporation, shall have power to declare and pay dividends upon the shares of its capital stock either (a) out of its net assets in excess of its capital as computed in accordance with the provisions of Sections 14, 26, 27 and 28 of this Chapter, or (b), in case there shall be no such excess, out of its net profits for the fiscal year then current and/or the preceding fiscal year; provided, how-

---

[1] For convenience we are setting out for comparison the respondent's computation wherein he treats the $6,799,446.67 as income and a similar computation on the basis of our holding that the $6,799,446.67 should, for the purpose of determining the liability of the guarantors, be treated as a return of capital. The computations follow:

|  | Respondent's computation | Present holding |
|---|---|---|
| Surplus of Export, Dec. 31, 1929 | $40, 213. 41 | $40, 213. 41 |
| Earnings for 1930, including and excluding $1,778,078.65 [1] | 3, 869, 542. 13 | 2, 091, 463. 48 |
| Available for dividends | 3, 909, 755. 54 | 2, 131, 676. 89 |
| Dividends paid during 1930 | 3, 824, 420. 00 | [2] 2, 046, 341. 35 |
| Balance available | 85, 335. 54 | 85, 335. 54 |
| Earnings or (loss) for 1931, including and excluding $1,910,240.77 [1] | 1, 881, 685. 49 | (28, 555. 28) |
| Available for dividends | 1, 967, 021. 03 | 56, 780. 26 |
| Dividends paid during 1931 | 3, 824, 930. 00 | [3] 2, 351. 73 |
| Capital (deficit) | (1, 857, 908. 97) | |
| Paid by guarantors in 1931 | 1, 912, 337. 50 | |
| Balance available | None | 54, 428. 53 |
| Earnings or (losses) for 1932-3-4 | (38, 418. 51) | (38, 418. 51) |
| Available for dividends | (38, 418. 51) | 16, 010. 02 |
| Dividends for 1932-3-4 were paid by the guarantors. | | |
| Earnings for 1935, including and excluding $3,111,127.25 [1] | 3, 978, 269. 25 | 867, 142. 00 |
| Available for dividends | 3, 939, 850. 74 | 883, 152. 02 |
| Dividends paid during 1935 | 3, 824, 617. 45 | 3, 824, 617. 45 |
| Balance available or capital (deficit) | 115, 233. 29 | (2, 941, 465. 43) |
| Less capital surplus of $1,755.63 and $2,284,557.85 contributed by guarantors in 1936, not here involved | | 2, 286, 313. 48 |
| Balance of capital (deficit) | | (655, 151. 95) |
| Earnings for first six months of 1936 | 921, 704. 29 | 921, 704. 29 |
| Available for dividends | 1, 036, 937. 58 | 266, 552. 34 |
| Dividend paid on June 30, 1936 | 1, 912, 285. 60 | 1, 912, 285. 60 |
| Liability of guarantors | 875, 348. 02 | 1, 645, 733. 26 |
| Petitioner's share (40 per cent) | 350, 139. 21 | 658, 293. 30 |

[1] $1,778,078.65 plus $1,910,240.77 plus $3,111,127.25 equals $6,799,446.67.
[2] $1,778,078.65 of the $3,824,420 was paid by the guarantors in 1934.
[3] $3,822,578.27 of the $3,824,930 was paid by the guarantors in 1931 and 1934

ever, that if the capital of the corporation computed as aforesaid shall have been diminished by depreciation in the value of its property, or by losses, or otherwise, to an amount less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets, the directors of such corporation shall not declare and pay out of such net profits any dividends upon any shares of any classes of its capital stock until the deficiency in the amount of capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets shall have been repaired. * * *

Under the above law we hold that, for the purpose of determining the liability of the guarantors under their contracts of guaranty, $655,151.95 of the earnings for the first six months of 1936 must be applied to wipe out the capital deficit of that amount, and that so much of the earnings were not available for the payment of the final dividend of $1,912,285.60.

In determining that Export had a capital deficit of $655,151.95, such determination has been made without taking into consideration Export's $100 in common stock. Common stock is not protected against impairment by the foregoing statute, but only "outstanding stock of all classes having a preference upon the distribution of assets."

This leaves for our determination whether the balance of the 1936 earnings after making good the capital deficit, which balance was in the amount of $266,552.34, was available for the payment of dividends. If it was not available petitioner is entitled to deduct the entire amount of $764,914.24 (40 per cent of $1,912,285.60), and, if it was, the amount deductible is limited to $658,293.30, as set out in our footnote 1.

We are of the opinion that, in accordance with the resolution of May 22, 1936, of the board of directors of Export, which is set out in our previous findings at 7 T. C. 1316, the amount of $266,552.34 must be held to have been available for the payment of the final dividend of $1,912,285.60. We so hold. It follows that petitioner was liable under its guaranty contract to pay only its share, 40 per cent, of the difference between $1,912,285.60 and $266,552.34 or $658,-293.30. We hold, therefore, that petitioner's deduction here in question is limited to the amount of $658,293.30, and it is not entitled to deduct the full amount of $764,914.24 which it claims.

Reviewed by the Court.

*Decision will be entered under Rule 50.*