Flint and Fulton, Inc., and its subsidiaries, Crosan, Inc., and Monterey Hotel Company v. Commissioner. Flint and Fulton, Inc. v. Commissioner.
Flint & Fulton, Inc. v. Commissioner
Docket Nos. 52194, 52195.
United States Tax Court
T.C. Memo 1956-252; 1956 Tax Ct. Memo LEXIS 42; 15 T.C.M. (CCH) 1293; T.C.M. (RIA) 56252; November 14, 1956
Robert V. Carton, Esq., 601 Grand Avenue, Asbury Park, N.J., for the petitioners. Stanley W. Herzfeld, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined that the petitioners were liable for the following deficiencies and for an addition to tax for failure to file a timely return for the year 1948: Deficiency
Income
Declared Value
Excess
Year
Tax
Excess-Profits Tax
Profits Tax
Addition to Tax
1942
$ 585.96
$108.78
1943
377.18
$21,695.14
1944
2,477.14
1945
6,485.69
839.99
24,246.13
1946
21,988.70
1948
4,577.39
$1,144.35
Some of the issues raised by the pleadings have been conceded and effect will be given to these concessions upon settlement under Rule 50. The remaining issues are: 1. Are petitioners *43 entitled to deductions for losses incurred pursuant to an agreement by petitioner, Flint and Fulton, Inc., to guarantee Flint Frozen Food, Inc. against losses on inventory transferred in 1946 by Flint and Fulton, Inc. to Flint Frozen Food, Inc., in exchange for shares of capital stock of Flint Frozen Food, Inc.? 2. Are the petitioners entitled to a deduction for 1946 of $32,088.00 for architect's fees? 3. Are the petitioners entitled to a deduction of $1,534.54 for 1946, which amount was never paid to the Otis Elevator Company for two doors for an electric freight elevator? 4. Are the petitioners entitled to a deduction of $1,000 for 1948, which amount represented a debt due for masonry work completed in 1947? 5. Are the petitioners liable for the addition to tax provided in Section 291 of the Internal Revenue Code of 1939 for failure to file their 1948 income tax return within the time prescribed by law? 6. Did the respondent err in reducing the excess profits credit claimed by Flint and Fulton, Inc. in its excess profits tax returns for the years 1942 to 1945, inclusive, by the amount of $90,028.45? Findings of Fact The petitioners are corporations having their principal *44 offices at 1010 Corlies Avenue, Neptune, New Jersey. All of their income and excess profits tax returns for the years involved were filed with the collector of internal revenue for the first collection district of New Jersey at Camden, New Jersey. Inventory Guaranty Flint and Fulton, Inc. kept its books on an accrual basis. For many years prior to 1945 it was engaged in diverse businesses including the frozen food business. Early in 1945 it deemed it expedient to separate its frozen food business from its other enterprises and enlarge this business. Various steps were undertaken toward forming a new corporation, to be called Flint Frozen Food, Inc. It was contemplated that some of the stock of the new corporation would be offered to the public, and in connection therewith the services of Ebasco Services, an investment company, were engaged to formulate a plan as to what was necessary and should be done to form such a corporation and to satisfy the requirements of the Securities Exchange Commission. Ebasco Services developed an outline in connection therewith. Under a plan of reorganization dated March 31, 1946, Flint Frozen Food, Inc., was to acquire, as of that date, in exchange *45 for a part of its capital stock assets of Flint and Fulton, Inc., subject to applicable liabilities consisting principally of a frozen foods inventory, various parcels of real estate, and accounts receivable. Under the plan Flint Frozen Food, Inc. was also to acquire, in exchange for part of its stock, all of the capital stock of Monmouth Products Co., Inc., Wheatley Canning Company, Inc., and Bewley Canning Company, Inc. The plan provided that business done by Flint and Fulton, Inc. after March 31, 1946 to the date of closing was to be for the benefit of Flint Frozen Food, Inc. It also provided that Flint and Fulton, Inc. was to receive 5,949 shares of the preferred stock of the new corporation for the assets transferred to it. Sanford C. Flint owned 83 1/3 per cent of the common stock of Flint and Fulton, Inc., and was its president. He also owned substantially all of the stock of Monmouth, all of the stock of Wheatley, and a majority of the shares of stock of Bewley. Under the plan he was to receive for his stock of these three corporations 286,703 shares of the common stock of Flint Frozen Food, Inc. The preparations in connection with the formation of the new corporation, including *46 the development of the plan in connection with the sale of stock to the public, were of approximately a year's duration. Toward the latter part thereof the frozen food market broke and there was a considerable decline in prices for frozen foods. Flint Frozen Food, Inc., was organized on July 6, 1946. At a special meeting of the board of directors of Flint and Fulton, Inc., held on July 22, 1946, a resolution was adopted authorizing its officers to execute an acceptance of the plan of reorganization in the name of the corporation and to deliver to Flint Frozen Food, Inc. proper instruments of assignment and conveyance. The following resolution was adopted: "RESOLVED, that this company shall not henceforth engage in any business which is, or might be, or might be deemed to be in any wise competitive with the business of Flint Frozen Food, Inc.; and to further agree to indemnify Flint Frozen Food, Inc. for any and all losses which may be incurred in the sale of the inventory and in the collection of the accounts receivable, to be assigned; and that the officers of this company be and they are hereby authorized to execute and deliver for, and on behalf of, and in the name of this *47 company an agreement to such effect with Flint Frozen Food, Inc." On the same date, July 22, 1946, Flint and Fulton, Inc. and Flint Frozen Food, Inc. executed a bill of sale which provided that Flint and Fulton, Inc., for valuable consideration, granted and conveyed to Flint Frozen Food, Inc. the following: "All of the Inventory of Merchandise of Flint and Fulton, Inc. as it existed on March 31, 1946, contained in the various warehouses as more particularly appears from and by the books and records of Flint and Fulton, Inc., and also in Schedule A of the said Plan of Reorganization, the cost or market value of which (whichever was lower) on March 31, 1946 was $1,251,187.23, part of which inventory however, was March 31, 1946 pledged and hypothecated with certain banks or lending institutions for loans aggregating $1,045,602.32 which are assumed by Flint Frozen Food, Inc.; it being understood and agreed that all changes that have occurred in said Inventory resulting from the transactions in the ordinary course of business of Flint and Fulton, Inc., since March 31, 1946, have been for the benefit and risk of Flint Frozen Food, Inc.; and the Inventory of Merchandise now carried by *48 Flint and Fulton, Inc., or appearing on its books and records is by this instrument, granted, assigned, transferred and set over to Flint Frozen Food, Inc., subject to all sums due and owing to banks and other lending institutions on any and all parts of such inventory pledged and hypothecated for loans, as more fully appears by the books and records of Flint and Fulton, Inc. the amount of which loans at the date hereof is assumed by Flint Frozen Food, Inc. It is further understood and agreed that Flint and Fulton, Inc. will indemnify Flint Frozen Food, Inc. for any and all losses that may be incurred in the sale of this inventory plus any and all carrying, storage and transportation charges and expenses incurred on said inventory up to the time of ultimate and final sale of same." The consideration received by Flint and Fulton, Inc. was 5,949 shares of the preferred stock of Flint Frozen Food, Inc. It was originally planned that Flint Frozen Food, Inc., be incorporated and that the assets of Flint and Fulton, Inc., be transferred to Flint Frozen Food, Inc., by March 31, 1946. The assets, however, were not transferred until July 22, 1946. In a circular dated August 2, 1946, prepared *49 to facilitate the sale to the public of stock of Flint Frozen Food, Inc., it is stated that Flint and Fulton, Inc., agreed by contract not to compete with Flint Frozen Food, Inc., but there is no reference in that circular to any inventory guaranty. No effort was made to sell the stock to the public because, by the time the requirements of the Securities and Exchange Commission had been met, conditions in the frozen food business had deteriorated to such an extent that the stock was unacceptable to prospective purchasers. On July 25, 1946, Flint and Fulton, Inc. wrote the Commissioner of Internal Revenue informing him of the reorganization and inquiring whether the income from the operations of the business for the period March 31 to July 22, 1946, should be included in its return for that year or in the return of Flint Frozen Food, Inc. The Commissioner advised Flint and Fulton, Inc. on August 16, 1946, that the income for this period was reportable by it. On September 27, 1946, the plan of reorganization was amended to make it effective as of July 22, 1946. The amendment provided in part: "Whereas, in the Plan of Reorganization, the net assets of Flint and Fulton, Inc. to be *50 acquired by and transferred to Flint Frozen Food, Inc. are set at a stated amount. Now, therefore Be It Resolved, that the net assets to be acquired by Flint Frozen Food Inc. as of July 22nd-1946 shall not be less than the amount of the net assets originally planned to be acquired by and transferred to on March 31st, 1946. That any adjustments necessary to bring the value of the net assets, set forth in the Plan of Reorganization, to be acquired as of March 31st, 1946 to a figure of equal amount as of the date of actual transferring and acquisition of July 22nd 1946, shall be made by reducing the amount of liabilities to be assumed by Flint Frozen Food, Inc. as of July 22nd, 1946." After the reorganization was completed on July 22, 1946, the stock of Flint Frozen Food, Inc. was owned by the following: Preferred
Common
Flint and Fulton, Inc.
5,949
Sanford C. Flint
286,703
Joseph D. Zenker
74,098
Others
193
103
Total
6,142
360,904 Joseph D. Zenker received 74,098 shares of common stock in exchange for 833 1/3 shares of stock of Bewley Canning Company, Inc. owned by him. Shortly after Flint Frozen Food, Inc. was organized in 1946, conditions in *51 the frozen food business became very acute, and banks which had made loans with the inventory as collateral began demanding immediate payment. It became necessary for Flint and Fulton, Inc., and its subsidiaries to make cash advancements to Flint Frozen Food, Inc. to enable that corporation to satisfy demands for loan payments and to prevent it from having a forced liquidation. The principal source of this cash was the proceeds from the sale of the Monterey Hotel which had been owned by Monterey Hotel Co., a wholly-owned subsidiary of Flint and Fulton, Inc.
The books of Flint and Fulton, Inc. and its subsidiaries and of Flint Frozen Food, Inc. show that the total amount of the advancements made by the Monterey Hotel Company was $235,000. These books do not show the charge of any specific amount against the advancements for any indebtedness of Flint and Fulton, Inc. resulting from the inventory guaranty. The determination of the inventory losses entailed a considerable amount of accounting, and the losses for 1947 and 1948 were not ascertained until the latter part of 1948 or early part of 1949. Flint Frozen Food, Inc. became a wholly-owned subsidiary of Flint and Fulton, Inc. in *52 1950. The amounts realized in 1947 and 1948 by Flint Frozen Food, Inc., from the sale of frozen foods acquired from Flint and Fulton, Inc., the values at which such inventory was taken over from Flint and Fulton, Inc., and various charges pertaining to such inventory were as follows: 1947
Selling Price
$ 93,745.86
Inventory Value 7/22/46
$125,521.01
Storage
11,000.64
Interest
5,544.78
Insurance
137.29
Freight
634.40
142,838.12
$ 49,092.26
1948
Selling Price
$ 41,290.21
Inventory Value 7/22/46
$ 42,226.75
Storage
14,175.62
Interest
4,839.82
Insurance
105.78
Freight
1,914.20
62,262.17
$21,971.96
A corporation income tax return was filed by Flint Frozen Food, Inc., and Subsidiaries, for the fiscal year June 6, 1946 to May 31, 1947, in which there was reported a net loss of $196,535.28. This, the first income tax return of Flint Frozen Food, Inc., was filed on September 5, 1947. A corporation income tax return was filed by Flint Frozen Food, Inc., and Subsidiaries, for the fiscal year ended May 31, 1948, on August 19, 1948, in which there was reported a net loss of $17,892.02. Flint and Fulton, Inc., on November 5, 1948, filed *53 claims for refund of income and declared value excess profits taxes for the years 1944 and 1945. In these claims Flint and Fulton, Inc., attempted to combine the losses sustained by Flint Frozen Food, Inc., in its first fiscal year with the income of Flint and Fulton, Inc., and then carried back the net loss as a deduction for the years 1944 and 1945. These refund claims and the returns of Flint and Fulton, Inc., for the years 1942 to 1945, inclusive, were assigned to a revenue agent for examination. Notice of rejection of the refund claims was given to Flint and Fulton, Inc., on or about June 17, 1949, in a report of the agent's examination of the aforesaid returns and refund claims. Flint and Fulton, Inc., did not claim on its 1947 income tax return a deduction for any loss in connection with its inventory guaranty to Flint Frozen Food, Inc. The return for the year 1947 was filed on March 15, 1948, and showed a normal tax net income of $3,095.66. Flint and Fulton, Inc., claimed a deductible loss in the amount of $18,553.96 on its income tax return for the year 1948 in connection with the inventory guaranty. That return, filed in March of 1952, showed a net loss of $4,142.47. *54 Architects' Fees The Monterey Hotel Company, a corporation whose stock was owned by Sanford C. Flint, was organized in connection with the purchase of the Monterey Hotel in the City of Asbury Park, New Jersey. At the time that the hotel was acquired it was on lease by the Howard Savings Institution of Newark to the Royal British Navy. On April 1, 1946, Flint and Fulton, Inc., acquired all of the stock of the Monterey Hotel Company. In 1945 Sanford C. Flint consulted with Ferrenz & Taylor, Architects, with respect to alterations to the Hotel Monterey. By written contract dated May 9, 1945, between Sanford C. Flint, therein identified as the owner, and Ferrenz & Taylor, identified as the architects, Ferrenz & Taylor agreed to prepare specifications and perform other services relating to the alternations of the Monterey Hotel. Sanford C. Flint agreed to pay Ferrenz & Taylor for such services ten per cent of the cost of the work plus other payments and reimbursements provided in the contract. On June 27, 1946, a bill showing a balance of $32,088 was submitted by Ferrenz & Taylor to Sanford C. Flint. After purchasing the hotel there was not sufficient capital to remodel and *55 the enterprise was abandoned. A portion of the plans and specifications had been submitted to contractors for bidding but none of the contemplated alterations were made. The hotel was sold in April 1946, to Krawin, Inc. After the sale of the hotel Ferrenz & Taylor continued sending petitioners plans. A dispute arose in 1946 as to the liability of petitioners for payment of the entire amount of $32,088. In discussions with the architects, Sanford C. Flint urged that since the proposed remodeling had been abandoned and the building sold in April 1946, an adjustment should be made in the amount of the charges. The architects placed the collection of their bill in the hands of an attorney in August 1946. In a letter to the attorney dated August 10, 1946, Sanford C. Flint stated that he was always willing to satisfy any legitimate claim the architects might have, but that all figures submitted "have been beyond any possible conception". On October 18, 1946, attorneys for the architects wrote to Flint according him an opportunity of arranging a settlement of the architects' claim within twenty days. The letter stated that if a satisfactory settlement was not concluded within that time, *56 the attorneys would proceed with litigation. On October 31, 1946, the amount of $32,088 was entered on the books of the Monterey Hotel Company as an accrued liability to Ferrenz & Taylor for professional fees. The Monterey Hotel Company kept its books on an accrual basis. On or about January 10, 1947, Ferrenz & Taylor commenced an action at law against Sanford C. Flint in the New Jersey Supreme Court for Monmouth County, to recover the amount of $32,088 which they claimed was due and owing for their services as architects. In an answer filed in that proceeding Sanford C. Flint denied any liability. The trial took place in the fall of 1949. During the trial it developed that neither partner of the plaintiff therein was a licensed architect of the State of New Jersey. On the technicality that the plaintiffs had no rights to use the courts of New Jersey to maintain the action, a dismissal was entered. Otis Elevator Company bill On February 7, 1946, Monterey Hotel Company entered into a contract with Otis Elevator Company, whereby Otis was to make new doors to be installed in a freight elevator. The doors were ordered soley because they were required by the New Jersey State Department *57 of Labor for safety purposes. The doors were delivered in June 1946 but were never used or installed because the remodeling of the hotel was abandoned and the hotel was sold to the Krawin Corporation in April 1946. The doors were delivered prior to the sale of the hotel and a bill was rendered therefor on July 3, 1946, in the amount of $1,534.56. This amount was entered on October 31, 1946, as an "account payable" in the cash book and journal of the Monterey Hotel Company under the caption: "Maintenance and Repairs". On October 21, 1946 and November 22, 1946 the Otis Elevator Company wrote to the Monterey Hotel Company requesting payment of its invoice of July 3. On December 10, 1946 the Monterey Hotel Company wrote the following letter to the Otis Elevator Company: "In Reply to your letters of December 2, November 22, and October 21, there is nothing we can add to the information previously given you that (1) The Monterey Hotel was sold by this corporation on April 24, 1946 to Krawin, Inc. (2) This corporation does not recognize any liability for materials shipped or liabilities incurred subsequent to April 24, 1946." On December 28, 1946, the Otis Elevator Company again *58 requested payment of its invoice of July 3, 1946 "so that it will not be necessary to take legal action to obtain payment of the amount we feel is due". In 1947 Krawin, Inc. agreed to purchase and pay for the doors and the Otis Elevator Company released Monterey Hotel Corporation from all debts and agreements arising under the contract of February 7, 1946. A deduction of $1,534.56 claimed by petitioners in their consolidated income tax return for 1946 was disallowed by the respondent. Battaglia bill The disbursement book of Flint Frozen Food, Inc. shows a disbursement of $1,000 to Fabio Battaglia, a mason contractor, in January 1948. This item was properly charged to Flint and Fulton, Inc. on the intercompany accounts. On Flint and Fulton's books the amount of $1,000 was charged to the "Repairs" account. A bill dated January 1, 1948 from Fabio Battaglia to Sanford Flint contains the following: 9/ 3/47 Bal.
So. Main St., Job
$1,465.33
12/30/47 Bal.
1108 Corlies Ave., Job
264.00
12/30/47 Bal.
So. Main St., Job
625.00
Total
$2,354.33
Rec'd 1/16/48
1,000.00
Bal.
$1,354.33
Rec'd 6/8/48
500.00
Bal.
$ 854.33
Rec'd 9/22/48
286.33
Bal.
$ 586.00
*59 In the return of petitioners for the year 1948 a deduction for repairs of $1,000 was claimed. This deduction was disallowed by the respondent. 1948 Return Petitioners' income tax return for the calendar year 1948 was filed on March 14, 1952, with the collector of internal revenue for the first collection district of New Jersey. Petitioners had received from that collector four extensions of time within which to file the return. The last of these extensions expired on July 15, 1949. Petitioners' failure to file their income tax return for the calendar year 1948 within the time prescribed by the Commissioner in pursuance of law was due to willful neglect and not to reasonable cause. Cost Basis of Real Estate Flint and Fulton, Inc. is a successor to the partnership of Fulton and Flint. The partnership was formed some time in the early 1920's. During the period of the partnership it acquired various pieces of real estate. In the early part of the year 1933, the partnership decided to transfer its business and assets to Flint and Fulton, Inc., a new corporation. In the spring of 1933 the partnership retained the firm of Rudolf, Cinnamon & Calafato, of Asbury Park, New *60 Jersey, as accountants, to close out the books of the partnership and set up the books of Flint and Fulton, Inc.
In setting up the books of Flint and Fulton, Inc., the accountants entered on those books as cost figures items appearing on a trial balance prepared by them as of December 31, 1932, from the partnership records of Fulton and Flint. Among such items on the trial balance was "Land and Buildings $378,386.36". In taking that figure from the partnership books, the accountants did not audit the books to determine whether the figure for land and buildings represented cost or reflected a write-up to take into account appreciation in value. The accountants did not go back of the figures on the partnership records as of December 31, 1932. There was available to the accountants a revenue agent's report of examination of the partnership, Fulton and Flint, for the year 1930. That report contained exhibits showing the amount of depreciation allowed on buildings owned by the partnership. The accountants deducted from the aforesaid total of $378,386.36: (1) the figures appearing in the depreciation schedules under the words "Corrected Balance Close of Period"; (2) amounts appearing in *61 other exhibits to the revenue agent's report dealing with depreciation on refrigeration plant and equipment under columns in such exhibits entitled "Corrected Balance Close of Period" and attributed the balance of $126,413.68 to land. In April 1954, the records of the partnership were stored in the basement of a building located at 1010 Corlies Avenue, Neptune, New Jersey. These records were destroyed during that month when a fire occurred on these premises and the basement of the building was flooded to a depth of seven feet. During the years 1944 to 1950, a revenue agent examined petitioners' excess profits tax returns for the years 1942 to 1945, inclusive. Petitioners' excess profits tax credit was computed on the invested capital basis. In the course of the agent's examination he found entries on the records of the partnership, which were then available, indicating that the cost to the partnership of the land which it transferred to Flint and Fulton, Inc. was $35,485.09. He also found an entry on the partnership books writing up the figure for land from $35,485.09 to $126,413.68. The revenue agent decreased the invested capital claimed by Flint and Fulton, Inc., in its excess *62 profits tax returns for the years 1942 and 1945, inclusive, by $90,928.59, the difference between the cost of the land to the partnership, Fulton and Flint, and the amount to which the land had been written up on the partnership books. The adjustment by the agent to the invested capital claimed in the petitioners' excess profits tax return was embodied in a revenue agent's report dated May 16, 1949, for the years 1942 to 1945, inclusive, which was sent to Flint and Fulton, Inc. Sanford Flint acknowledged receipt of this report for Flint and Fulton, Inc. on July 14, 1949. At the time that this revenue agent's report was received by Flint and Fulton, Inc., that corporation had available the original books of account and records pertaining to the acquisition of the land in question by the partnership, Fulton and Flint. They were also available on July 11, 1950, when Flint and Fulton, Inc., filed a protest against twenty-nine separate findings in the aforesaid revenue agent's report of examination for the years 1942 to 1945, inclusive. Flint and Fulton, Inc., however, failed to include the agent's adjustment of invested capital as one of the findings questioned. A Field Conference *63 Report prepared after a conference on September 26, 1950, between Sanford Flint, representing Flint and Fulton, Inc., and a conferee of the Internal Revenue Service, Emmett T. Molloy, with respect to the protest filed by Flint and Fulton, Inc., to the revenue agent's report does not include among "Issues Involved" the agent's adjustment to invested capital. The Commissioner reduced by $90,928.59 the invested capital credit claimed by Flint and Fulton, Inc., in its excess profits tax returns for the years 1942 to 1945, inclusive. Opinion RAUM, Judge: 1. Inventory Guaranty. Petitioners contend that the respondent erred in not allowing deductions for losses in the amounts of $49,092.96 for 1947 and $21,971.96 for 1948. These amounts represent losses sustained by Flint Frozen Food, Inc. in those years upon the sale of a frozen food inventory. Flint and Fulton, Inc. transferred this inventory, certain parcels of real estate, and accounts receivable to Flint Frozen Food, Inc. on July 22, 1946, and in a bill of sale executed on that date agreed to indemnify Flint Frozen Food, Inc. for any and all losses incurred in the sale of the inventory. In return Flint and Fulton, Inc. received *64 5,949 shares of the preferred stock of Flint Frozen Food, Inc. The returns for Flint and Fulton, Inc. and its subsidiaries for the years 1947 and 1948 were filed on an accrual basis. By reason of the guaranty Flint and Fulton, Inc. became obligated to pay the losses sustained by Flint Frozen Food, Inc. upon the sale of the inventory in 1947 and 1948. The respondent contends that the agreement of guaranty was part of the consideration given by Flint and Fulton, Inc. for 5,949 shares of stock, and that any payments required to be made because of the guaranty were capital expenditures, which did not entitle that corporation to the claimed deductions. The petitioners urge that the guaranty was given to induce outside capital to invest in the stock of Flint Frozen Food, Inc. and that this Court has held that where a guaranty is given for a legitimate business reason apart from the primary purpose of acquiring stock, payments under the guaranty "are deductible business expenses; as losses". They cite and rely upon Camp Manufacturing Company, 3 T.C. 467, and Standard Oil Company of New Jersey, 7 T.C. 1310, 11 T.C. 843. An examination of the cited cases *65 discloses that they involved instances in which a corporation made expenditures to facilitate or promote its business. In the Camp case a corporation, for the purpose of replenishing its working capital, sold a portion of the preferred stock of another corporation owned by it and guaranteed to make good to purchasers the dividends on the stock in the event of default and its par value in the event of liquidation. Subsequently the corporation paid each of the purchasers $5.00 per share to be released from the guaranty. In the Standard Oil case a corporation exchanged part of its preferred stock guaranteed as to dividends and par value on liquidation for the capital stock of another corporation. The purpose of the transaction was to protect and develop sales of gasoline and related products which the latter corporation had been purchasing prior to the exchange. The taxpayer was subsequently required by the guaranty to pay a substantial sum. In both of these cases this Court held that the payments made were deductible. In the Standard Oil case, 11 T.C. at p. 854, this Court said: "* * * In the instant proceeding the origin and nature of the guaranty agreement of November 6, 1929, shows *66 that it was entered into by petitioner as an essential, direct, and intimate part of its sales of petroleum products to Anglo. Petitioner considered it was necessary, and, as we said in the Camp case, it was 'a type of obligation which business concerns under similar circumstances might normally and ordinarily be expected to incur.' We think that the protection and development of sales in the instant case is as much a business purpose as was the obtaining of working capital in the Camp case. We hold, therefore, that, since any claim petitioner might have against Export was worthless in 1936, petitioner is entitled to deduct in the taxable year 1936, either as an ordinary and necessary expense or as a loss, any payment made in 1936 for the dividends due in 1936 for which petitioner was liable under the guaranty contract of November 6, 1929." The reasons which justified the allowance of deductions in the Camp and Standard Oil cases are not present here. When Flint and Fulton, Inc. transferred its frozen food inventory on July 22, 1946 to Flint Frozen Food, Inc., it ceased to engage in the frozen food business. The agreement to indemnify Flint Frozen Food, Inc. against any loss on the *67 sale of the inventory was not entered into, therefore, for the purpose of protecting or developing the business of Flint and Fulton, Inc. It inured to the benefit of Flint Frozen Food, Inc. and its business. And this is true whether, as petitioners urge, the objective in giving the guarantee was to induce outside capital to invest in the stock of Flint Frozen Food, Inc., or whether, as respondent urges, the objective was to ensure that Flint and Fulton, Inc. would make good any deficiency in the value of the inventory. The agreement was part of the consideration which Flint and Fulton, Inc. gave Flint Frozen Food, Inc., in exchange for 5,949 shares of the latter's preferred stock. The respondent was right in determining that any amounts which Flint and Fulton, Inc. was required to pay pursuant to the agreement were capital expenditures rather than ordinary and necessary business expenditures or losses. Cf. United Gas Improvement Company, 25 T.C. 229; Bermont Oil Co. v. Helvering, 91 Fed. (2d) 710 (C.A.D.C.). 2. Architects' Fees. On June 27, 1946, a firm of architects sent Sanford C. Flint a bill for $32,088 for services performed in connection with a *68 proposed remodeling of the Monterey Hotel. Liability for the payment of this bill was contested by Flint, the president of the Monterey Hotel Company, on the ground that the remodeling of the hotel had been abandoned and the hotel sold in April 1946. The architects placed the collection of their bill in the hands of attorneys in August 1946, and, when letters demanding payment failed to elicit any favorable response, a court action to collect the $32,088 was commenced in January of 1947. In that proceeding Flint denied any liability for the amount of the bill and the court rendered a decision in his favor on technical grounds. The Monterey Hotel Company, which was on an accrual basis, accrued the amount of $32,088 on its books as a liability on October 31, 1946. The petitioners contend that the respondent erred in not allowing the deduction of this amount in computing the amount of the company's taxable net income for 1946. We disagree. In Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, at page 519, the Supreme Court said: "It has never been questioned that a taxpayer *69 who accounts on the accrual basis may, and should, deduct from gross income a liability which really accrues in the taxable year. It has long been held that, in order truly to reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer. * * *" See also Security Flour Mills Co. v. Commissioner, 321 U.S. 281, 284; United States v. Anderson, 269 U.S. 422, 441. As heretofore noted, during the year 1946, Flint, the president of the Monterey Hotel Company, was engaged in a controversy with the architects as to its liability for the payment of their bill. In these circumstances its liability was not fixed in that year and the respondent correctly determined that petitioners were not entitled to accrue and deduct the amount of $32,088 as a 1946 expense. The conclusion reached renders it unnecessary to discuss or decide a persuasive alternate contention of the respondent that even if this Court held that the liability to the architects was *70 properly accrued in 1946, no deduction would be allowable because the liability was for a capital expenditure. 3. Otis Elevator bill. In 1946 the Monterey Hotel Company entered into a contract with the Otis Elevator Company whereby Otis was to make new doors for an elevator in the Monterey Hotel. After the doors were delivered and a bill received from Otis in the amount of $1,534.54, the Monterey Hotel Company denied liability. The respondent disallowed a deduction of $1,534.54 claimed in petitioners' consolidated income tax return for 1946. The respondent did not err in disallowing this deduction. Dixie Pine Products Co. v. Commissioner, supra; Security Flour Mills Co. v. Commissioner, supra; United States v. Anderson, supra. 4. Battaglia bill. In a bill dated January 1, 1948, Fabio Battaglia, a mason contractor, billed Sanford Flint for work completed on three projects in 1947. The total amount of the bill was $2,354.33, and $1,465.33 of this amount represented the balance due as of September 3, 1947, for an item described as the "So. Main St. Job". In the return filed for petitioners for the year 1948, a deduction of $1,000 was claimed *71 for a payment made of a portion of the bill on January 16, 1948. Petitioners contend that the respondent erred in disallowing the claimed deduction. We agree with petitioners on this issue, for we think that on this record, although the evidence is scanty, this item, identified as "repairs", was deductible and fairly accruable in 1948 when the bill was rendered. Cf. Cold Metal Process Co., 17 T.C. 916, 932-933. 5. Addition to tax for late filing of 1948 return. Petitioners filed their income tax return for the year 1948 on March 14, 1952. Four extensions of time were granted to them within which to file that return. The last of the extensions expired on July 15, 1949. At the time the first extension was applied for it was stated that the extension was necessary because of inability to assemble all the information necessary to prepare a consolidated income tax return by March 15, 1949. At the trial Sanford C. Flint, president of petitioners, attributed the delay in the filing of the return to the fact that petitioners' financial condition was such that they were unable to employ accountants or other assistance to prepare the return. The evidence submitted does not *72 convince us that petitioners were in such a precarious financial condition that it was necessary to delay the filing of the 1948 return until approximately two years and eight months from the expiration date of the last extension, or that the delay was due to any other reasonable cause. We have therefore found as a fact that their failure to file a timely 1948 return was due to willful neglect and not to reasonable cause. The respondent's action in imposing the addition to tax provided in Section 291 of the Internal Revenue Code of 1939 is approved. 6. Reduction of Invested Capital. In computing its invested capital for excess profits tax purposes for the years 1942 to 1945 inclusive Flint and Fulton, Inc. claimed a basis for land, which it had acquired in 1933 from a predecessor partnership in a nontaxable exchange, of $126,413.68. The respondent reduced this amount by $90,928.59. This action of respondent was based on a report received from a revenue agent who had examined the excess profits tax returns of petitioners for the years 1942 to 1945 inclusive. In the course of his examination the agent found entries on the books of the predecessor partnership indicating that the cost *73 of the land to the partnership was $35,485.09, and that this land had been written up on the partnership books to $126,413.68 to reflect appreciation in value. The agent in his report reduced the invested capital claimed in petitioners' returns by the amount of $90,928.59, the difference between $126,413.68 and $35,485.09. Petitioners had the burden of proving that the action of the respondent in reducing the invested capital of Flint and Fulton, Inc. was erroneous. At the trial they produced two witnesses. One was an accountant who was employed in 1933 to close out the partnership books and prepare books of account for the new corporation, Flint and Fulton, Inc. We are convinced from a study of his testimony that the accountant in the course of his employment did not ascertain or make any attempt to ascertain the cost of the land in question to the partnership. The other witness was the president of Flint and Fulton, Inc. He testified that the properties were acquired by the partnership within the period of four to ten years prior to the formation of the corporation, and that, although he was active in the acquisition of the properties, he could not recollect what was paid for any *74 specific property. He also testified that he had no knowledge of any write-up of the cost of the properties on the books of the partnership. After a careful consideration of all the evidence produced by petitioners our conclusion is that they did not prove that the respondent erred in reducing the invested capital claimed by Flint and Fulton, Inc. in its returns for the years 1942 to 1945 inclusive by $90,928.59. Decisions will be entered under Rule 50.