Arthur F. BROOK and Ruth T. Brook,
Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

WIRE-O BINDING COMPANY, Inc.,
Respondent.

Nos. 84, 85, Dockets 29801, 29802.

United States Court of Appeals
Second Circuit.

Argued Dec. 9, 1965.

Decided May 18, 1966.

Irving M. Gruber, of Gruber & Gruber, New York City, for petitioners Brook.

Gilbert E. Andrews, Atty., Dept. of Justice, Washington, D. C. (John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson and Marco S. Sonnenschein, Attys., Dept. of Justice, on the brief), for respondent Comm. of Internal Revenue.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Taxpayers Arthur F. and Ruth T. Brook petition for review of a decision of the Tax Court, Fay, Judge, T. C. Memo. 1964–285, holding installment payments on the sale of two contracts taxable as short term taxable gain. The Commissioner cross-petitions for review, seeking a holding that the assets in the hands of the purchasing corporation are nondepreciable. We find error and remand for treatment as long term capital gain of so much of the consideration as is attributable to the earlier contract.

Arthur Brook operated a proprietorship, Wire-O Binding Co., starting in 1935, under a franchise from Trussell Manufacturing Co. (later known as Wire-O Corp.), the holder of and applicant for certain patents covering wire binding processes. From 1935 until 1944 the franchise was pursuant to oral agreement. In 1944 Brook left his company to manage Trussell, and, worried about the conduct of his father-in-law, who had controlled Trussell, he asked that the franchise be reduced to writing. Accordingly, on August 2, 1944, Brook and Trussell entered into a written contract granting "to the licensee the rights to assemble and sell Wire-O products," and granting "that during the life of this contract it [Trussell] will not license any other concern to manufacture or assemble Wire-O products in Greater New York without the written consent of the licensee." The agreement recited that Trussell was the owner of six numbered patents, and continued, "the licensee is desirous of securing from said patentee certain rights to use the inventions and any improvements * * *" The contract provided that its term would be "for the life of the patents mentioned or referred to on page 1 of this contract." The only patents *mentioned* were those six, the last of which was granted on December 26, 1939, and therefore was to expire on December 26, 1956. Brook testified that the intent of the parties to the 1944 agreement had been to reduce to writing the entire oral agreement of 1935.

By about 1946, two other products of Trussell, Mult-O and Flex-O, became an important part of Brook's business. Prior to the 1944 agreement they were a lesser part of the business. The proprietorship was being run by one Blissert, who had assisted Brook from 1935 on, except during his service during World War II. In 1955 Blissert was desirous of obtaining an interest in the business which he had run for nine years. Brook regarded him as essential. Accordingly Brook and Blissert formed Wire-O Binding, Inc., with contributions of $18,000 and $12,000, respectively, Brook taking 60% and Blissert and his wife 40% of the stock. Later Blissert acquired 15% from Brook; Brook had transferred the remaining 45% to three family trusts.

On April 11, 1955, Brook and Wire-O Corp. (Trussell) entered into another agreement, allegedly to clarify ambiguities in the 1944 agreement. The 1955 contract pointed out that Wire-O had an improvement patent which would expire on June 9, 1970, and said that the 1944 agreement gave Brook "an exclusive franchise to manufacture, assemble, and sell

Wire-O products * * * " By the new contract the parties agreed that the 1944 agreement would end on June 9, 1970, and further that "Since the intent of the August 2, 1944 agreement was to have the franchise cover all merchandise offered for sale by the corporation through its licensee distribution," the 1944 agreement would be formally extended to cover Mult-O and Flex-O, as well as any products to be developed.

Wire-O Binding, Inc. was formed on April 19, 1955, and on April 27 Brook assigned his 1944 and 1955 contracts to the new corporation for 15 annual payments of $40,000 each, Brook and Blissert having observed that the proprietorship had average net profit of about that sum for the previous three years, and that the business was expected to continue to expand.

The Tax Court observed that the 1955 contract was of limited duration so that the corporation could obtain depreciation deductions on the franchise. The Tax Court also agreed with Brook's claim that the 1944 contract was ambiguous as to duration, but used this to support its conclusion that the 1955 contract was a new piece of property, held for only two weeks before sale.

Brook reported the $40,000 payments, which were paid regularly, as long term capital gain (zero basis). The Commissioner in the notice of deficiency concluded that there was no sale of the contracts, that the rights to $40,000 per year were in the nature of stock in the new corporation, and that the payments were dividends taxable as ordinary income, with the 4% dividend credit. In the Tax Court this, and other theories, were rejected. The Tax Court concluded that while, as petitioner argued, there was a sale of a capital asset, it was the 1955 contract, a new asset, which was sold, the 1944 agreement having been terminated, and the asset having been held less than six months, gain was taxable as short term capital gain.

Brook suggests that the Tax Court decided an issue not raised by the pleadings. It is true that the notice of deficiency asserted that "the amounts received * * * are dividends and not capital gain." Taxpayers' petition claims that the Commissioner erred in this assertion and asks the Tax Court to determine that there was no deficiency. The answer asks that the deficiency asserted by the Commissioner be approved. The issue whether the gain was short term or long term capital gain therefore had to be decided and was before the Tax Court. Unlike Louis Welhouse, Jr., 3 T.C. 363 (1944) and Camp Wolters Enterprises, Inc., 22 T.C. 737 (1954), aff'd 230 F.2d 555 (5 Cir.), cert. den. 352 U.S. 826, 77 S.Ct. 39, 1 L.Ed.2d 49 (1956), the pleadings present a question of the treatment of given amounts received in a particular transaction. "The phrasing of the notice of deficiency * * * is not the cause of action and does not frame the issues * * * If the Commissioner finds one fact or reason which he believes supports his adverse determination, he is not required to express his views on any or all other matters relating to the item * * It is not the Commissioner's method of determination or computation which is the substance of the proceeding, for the deficiency may be correct despite a weakness in arriving at it or explaining it." Edgar M. Carnrick, 21 B.T.A. 12, 21 (1930), and cases cited; Wilkes-Barre Carriage Co., Inc., 39 T.C. 839 (1963), aff'd per curiam 332 F.2d 421 (2 Cir. 1964); 9 Mertens, Law of Federal Income Taxation § 50.63. We note that petitioner was given opportunity to reargue, and pointed to no other evidence not before the Tax Court.

Petitioners dispute the Tax Court's conclusion that the 1955 contract terminated the 1944 contract. We agree that the later contract, creating significant new rights, left some others untouched, and neither terminated nor replaced the earlier contract. Accordingly we remand for an allocation of gain between amounts realized on the sale of the 1944 contract and amounts realized on the sale of the 1955 contract.

Arguable differences between the two contracts include duration, products

covered, and type of franchise. With regard to duration it is not disputed that the 1955 contract was to end in 1970. The Tax Court held, and petitioners now urge, although for a different reason, that the 1944 contract was for an indefinite term, because the duration depended on the expiration date of both patents and improvement patents. This would be true if the word "improvements" on page 1 of the contract was a patent "mentioned or referred to on page 1 of this contract," a construction on which we express no opinion. On remand the parties and the Tax Court may freely reexamine this question.

As to products covered, it is unclear from the 1944 contract whether it covered Mult-O and Flex-O, as well as Wire-O, while the 1955 contract clearly covered all three. This question, too, may be reexamined on remand.

The third difference between the two contracts was in the type of franchise. The 1944 contract granted rights to *assemble* and *sell*, with no restriction as to geographical area. It also recited that the patentee would not license any other concern to *manufacture* or *assemble* in Greater New York, without the licensee's consent. Brook's right to assemble was exclusive, but his right to sell was not. The 1955 agreement said, erroneously, that the 1944 agreement gave Brook an exclusive franchise to manufacture, assemble, and sell in Greater New York. We assume, but do not decide, that the 1955 contract did at least create such rights.

■ The Commissioner argues that the 1955 contract is inconsistent with the 1944 contract, and therefore, as the later contract, replaces it. See 6 Corbin, Contracts, § 1296. But under this rule, in order completely to replace it, the later contract must completely cover the subject matter of the earlier. Here, this is not so; the 1955 contract, for instance, leaves untouched the licensee's non-exclusive right to assemble and sell outside Greater New York. Furthermore, the alteration in the duration of the contract, the creation of a right to manu-

facture in Greater New York, and the making of the pre-existing right to sell exclusive in Greater New York, all amount to a contract which is consistent with the old contract. The new contract adds to the old; it does not replace it.

Accordingly we remand to the Tax Court to determine what part of the gain realized is attributable to the 1955 contract, and not attributable to the 1944 contract, and to treat that gain attributable to the 1944 contract as from property held for more than six months.

This treatment is similar to that which would obtain if the 1955 contract were viewed as modifying the 1944 contract, and as the only contract defining the rights of the parties. See Paul v. Commissioner of Internal Revenue, 206 F.2d 763 (3 Cir. 1953); Dunigan v. Burnet, 62 App.D.C. 221, 66 F.2d 201 (1933); Commissioner of Internal Revenue v. Williams, 256 F.2d 152, 155 (5 Cir. 1958), on remand Harold G. Williams, T. C. Memo. 1959–104, aff'd 285 F.2d 582 (5 Cir. 1961); United States v. Ivey, 294 F.2d 799, 806 (5 Cir. 1961); Fred Draper, 32 T.C. 545, 549 (1959) (losses). See also Watson v. Commissioner of Internal Revenue, 345 U.S. 544, 73 S.Ct. 848, 97 L.Ed. 1232 (1953), rehearing denied 345 U.S. 1003, 73 S.Ct. 1128, 97 L.Ed. 1408.

■ We are not unaware that petitioners might have avoided ordinary tax rates had the 1944 contract been assigned to the corporation, and the corporation negotiated the new contract; see, however, General Artists Corp. v. Commissioner of Internal Revenue, 205 F.2d 360 (2 Cir.), cert. den. 346 U.S. 866, 74 S.Ct. 105, 98 L.Ed. 376 (1953), and Commissioner of Internal Revenue v. Starr Bros., 204 F.2d 673 (2 Cir. 1953). But petitioners did not choose to cast the transactions in this form, or to wait six months before the sale, and we hold them to the form they chose. Television Industries v. C. I. R., 284 F.2d 322, 325 (2 Cir. 1960).

■ It is necessary, on the question raised by the Commissioner's cross-peti-

tion, whether the contracts in the hands of the corporation are depreciable, to remand also, for if the 1944 contract is held to have expired in 1956, depreciation in 1957, the year at issue here, must be calculated only from that part of the corporation's basis for the contracts allocated to the 1955 contract.

Reversed and remanded.