Arthur F. Brook and Ruth T. Brook v. Commissioner. Wire-O Binding Company, Inc. v. Commissioner.
Brook v. Commissioner
Docket Nos. 3482-62, 3483-62.
United States Tax Court
T.C. Memo 1969-60; 1969 Tax Ct. Memo LEXIS 236; 28 T.C.M. (CCH) 346; T.C.M. (RIA) 69060; March 26, 1969, Filed *236 Irving M. Gruber, for the petitioners. John K. Antholis and James Q. Smith, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: These cases are presently before the Court on remand from the United States Court of Appeals for the Second Circuit 360 F. 2d 1011). The proceedings have been consolidated. The Court of Appeals has remanded the cases to the Court to make findings relating to a contract dated April 27, 1955. The contract was between Arthur F. Brook together with his wife, Ruth T. Brook (hereinafter referred to sometimes as Brook), and Wire-O Binding Company, Inc. (hereinafter referred to sometimes as Binding). Pursuant to the contract of April 27, 1955, Brook transferred rights held under contracts dated August 2, 1944, and April 11, 1955 (hereinafter referred to sometimes as the 1955 contract). On remand this Court is to determine what part of the gain realized is attributable to the 1955 contract rather than to the 1944 contract. Gain attributable to the latter contract is to be treated as long-term capital gain. We also must determine whether Binding can amortize the purchase price of the contracts. If our determination *237 is affirmative, we must decide whether the 1944 contract expired in 1956. If the 1944 contract is held to have expired in 1956, depreciation in 1957, the year at issue here, must be calculated only from that part of Binding's basis allocated to the 1955 contract. Brook v. Commissioner, 360 F. 2d 1011 (C.A. 2, 1966). This Court had previously held T.C. Memo. 1964-285) that the 1955 agreement replaced the 1944 agreement. Thus, Brook had held the prior agreement only for sixteen days until its transfer on April 27, 1955. Brook therefore must treat his entire gain as short-term capital gain. This Court also held that Binding was entitled to a depreciation deduction. We found that the contractual rights acquired by Binding had a definite useful life of approximately fifteen years. Findings of Fact Upon joint motion by the parties, the cases were set for trial for the purpose of taking further evidence. The new evidence consists of two supplemental stipulations of facts, oral testimony, and exhibits. The supplemental stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. The facts pertinent to the remand *238 are as follows: Brook and his wife, Ruth filed joint federal income tax returns for the calendar years 1956 and 1957, prepared on the cash method of accounting, with the district director of internal revenue, Albany, New York. Binding, a New York corporation, filed its corporate income tax return for the calendar year 1957, prepared on an accrual method of accounting, with the district director of internal revenue, Manhattan, New York. Binding was incorporated on April 19, 1955, to take over the conduct of a bindery business. Brook had been operating the binding business as a sole proprietorship under the name of Wire-O Binding Company (hereinafter referred to as the proprietorship). Brook first entered the business in 1935 when he accepted an offer of a franchise from Trussell Manufacturing Co. (hereinafter referred to as 348 Manufacturing). C. D. Trussell, who was soon to be Brook's father-in-law (hereinafter referred to as Trussell), tendered the offer on behalf of Manufacturing. Trussell explained to Brook that Manufacturing had developed a new type of binding process. Manufacturing was seeking somebody to operate a bindery in the New York City area using that type of binding. *239 Trussell offered Brook an exclusive franchise to assemble and manufacture binding in the Greater New York area. Brook could also sell in the Greater New York area as well as outside this area. Such right to sell would not be exclusive. Brook accepted this offer in March 1935. The agreement between Brook and Manufacturing was oral. The parties did not reduce the agreement to writing until 1944. It was Brook's understanding that the original franchise was unlimited in duration, and so we find that it was. Brook's franchise also was limited to one product, Wire-O binding. During 1934 through 1936 Manufacturing or its assignor had applied for patents on various inventions. A total of six patent applications were filed. Between March 30, 1937, and September 13, 1938, patents were granted with respect to five of the patent applications filed by Manufacturing or its assignor. On December 26, 1939, a patent was granted with respect to the sixth patent application so filed. Because a patent creates a statutory monopoly for 17 years, all of these patents were to, and did in fact, expire between March 30, 1954, and December 26, 1956. When Brook acquired the original franchise, he did not *240 acquire any interest in the three patents. These patents related to the wire-forming machine, the process of wire forming, or the punching machine. As of June 1944, Manufacturing was confronted with serious financial problems. These resulted, in part, from losses sustained by it because of rejects on war contracts. Moreover, because of wartime priorities, it could not obtain sufficient quantities of wire for its binding business. Manufacturing was also threatened by the possibility of two substantial lawsuits. In an attempt to raise funds to enable it to "weather" these problems, Manufacturing's board of directors decided to sell, among other of its assets, a machinery rental agreement (including the underlying machinery) entered into with Brook's proprietorship. The asking price was set at $20,000. Manufacturing did not wish to offer the machinery rental agreement to an "outsider," first, because its need for cash was urgent, and second, because it did not want the trade to learn of its weak financial condition. In addition to Trussell's wife and C. M. Conger, then president of Manufacturing, Manufacturing solicited Robert Blissert, who was then in the Army, and Brook's wife, Ruth, *241 with regard to the purchase of the machinery and the rental agreement. The proprietorship was, because of wartime pressures, suffering from a shortage of materials and a lack of competent management. Conger and Trussell's wife believed the machinery rental agreement was too speculative an investment. Blissert, who believed that the proprietorship would be able to "pull through" and eventually be profitable, finally agreed to purchase a one-third interest in the machinery and the rental agreement, for which he paid $6,666.66. Brook's wife agreed to purchase a two-thirds interest therein. Manufacturing effected this sale on or about July 1, 1944. Ruth Brook then gave a onetwelfth interest in her share to Brook's aunt, Mary Farrell. These three individuals on or about August 17, 1944, formed a partnership known as Brook, Blissert and Farrell, the sole function of which was to lease to the proprietorship the machinery needed in its bindery business. During the spring and early summer of 1944, when the directors and shareholders of Manufacturing were attempting to sell some of Manufacturing's assets in order to improve its financial condition, Trussell repeatedly interfered in a manner *242 which Brook regarded as cantankerous and adverse to the best interest of Manufacturing. Having lost his confidence in Trussell and concerned that Trussell might, in some way, attempt to abrogate the original franchise (which was oral) under which the proprietorship was operating, Brook advised Conger that he wanted the original franchise reduced to writing. Therefore, on August 2, 1944, Manufacturing and Brook entered into an agreement which provided, in pertinent part, as follows: THIS AGREEMENT, entered into this 2nd day of August, 1944, between [MANUFACTURING] * * *, hereinafter called "patentee" and ARTHUR F. BROOK * * *, hereinafter called "licensee," WITNESSETH WHEREAS the patentee is the owner of U.S. patents numbers 2,075,168; 2,112,389; 2,114,259; 2,116,589; 2,130,318; 349 2,185,004 relating to or covering Wire-O process, and WHEREAS the licensee is desirous of securing from said patentee certain rights to use the inventions and any improvements which the patentee may make upon them, of said binding device in the manufacture of Wire-O products. NOW THEREFORE, for and in consideration of the mutual terms and agreements herein contained the parties hereto agree *243 as follows: First. That the patentee hereto grants to the licensee the rights to assemble and sell Wire-O products. Second. The patentee hereby grants that during the life of this contract it will not license any other concern to manufacture or assemble Wire-O products in Greater New York without the written consent of the licensee. Third. That the patentee will furnish the formed "C" shape wires constituting a part of said inventions at prices as low as made to any other comparable purchaser. Fourth. The licensee argees to buy all formed Wire-O wires which it will use during the term of this agreement from the patentee and no one else. Fifth. The licensee shall have the right to use the trade-mark "Wire-O" on its merchandise and in advertising and publicity pertaining to this method of wire binding. Sixth. The term of this contract shall be for the life of the patents mentioned or referred to on page 1 of this contract. Seventh. This agreement shall be binding upon the parties hereto, their successors of assigns. From that time until April 11, 1955, the foregoing agreement continued to be the fundamental source of the proprietorship's rights to assemble and *244 sell the Wire-O binding developed by Manufacturing. As we have previously found, the agreement of August 2, 1944, merely reduced the original franchise to writing. The agreement conveyed to the proprietorship an exclusive right to assemble Wire-O binding in the Greater New York area. The agreement also granted a nonexclusive right to sell. This right to sell was without any geographical limitations. Manufacturing agreed not to license any other concern to manufacture Wire-O binding in Greater New York. Manufacturing, however, did not affirmatively convey a right to manufacture to Brook. As of August 2, 1944, Manufacturing had developed other binding processes in addition to Wire-O. These other processes included Mult-O, Cushion-Edge and machinery, and Flex-O. The agreement of August 2, 1944, however, did not convey any rights with regard to any binding process other than Wire-O. Sometime after 1946 Brook did begin to distribute to a significant extent Mult-O and Flex-O bindings in the New York area. Nonetheless, his rights with respect to products other than Wire-O did not arise from the agreement of August 2, 1944. The agreement of August 2, 1944, was for an indefinite term. *245 The duration of the agreement depended on the expiration date of both patents and improvement patents. The word "improvements" on page 1 of the agreement was a patent "mentioned or referred to on page 1 of this contract." On April 14, 1948, Manufacturing filed a patent application on an automatic paper punching machine to be used in connection with the Wire-O binding process. A patent thereon was granted on June 9, 1953. That patent will expire on June 9, 1970. In 1955 Brook agreed to sell to Blissert an interest in his proprietorship. They further agreed to incorporate the business. Prior to the formation of the corporation Brook on April 11, 1955, entered into the following agreement with Manufacturing: WHEREAS an agreement was entered into on August 2, 1944, between [Manufacturing] * * * and Arthur F. Brook, * * * under which said corporation granted to said Arthur F. Brook certain rights in connection with specified inventions of the corporation and any improvements which might be made thereon, and WHEREAS said agreement referred specifically to six patents and said corporation has since secured an additional patent (# 2,641,321) which expires on June 9, 1970 and which *246 is an improvement upon one of the patented inventions referred to in the August 2, 1944 agreement, and WHEREAS, the said agreement of Aug. 2, 1944 gave to said Arthur F. Brook an exclusive franchise to manufacture, assemble and sell Wire-O products in Greater New York for the life of the contract, which was to be for the life of the patents mentioned or referred to in said agreement, and WHEREAS the parties hereto desire to resolve any ambiguity in the said August 2, 1944, agreement as far as the term of said contract and as far as the products covered thereby are concerned: 350 NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS: 1. The term of the said August 2, 1944 agreement between the parties hereto shall end on June 9, 1970, that being the expiration date of patent #2,641,321, which is an improvement patent referred to in and covered by the said agreement; and the exclusive franchise of Arthur F. Brook for Greater New York shall end on June 9, 1970. 2. Since the intent of the August 2, 1944 agreement was to have the franchise cover all merchandise offered for sale by the corporation through its licensee distribution, the said agreement is hereby formally extended *247 to cover such products as Mult-O and Flex-O as well as any other such products which Wire-O Corporation shall develop. However, neither the development of new products nor the securing of further improvement patents by the said corporation shall extend the franchise agreement beyond the settled termination date of June 9, 1970. Brook paid nothing for the original oral franchise granted by Manufacturing in 1935. Moreover, he was not required to pay anything at the time it was reduced to writing on August 2, 1944. Nor did he receive any money from or pay any money to, Manufacturing in connection with his execution of the new franchise on April 11, 1955. On April 19, 1955, Binding was incorporated under the laws of the State of New York in order to take over the business theretofore operated by the proprietorship. Although Blissert originally had wanted 50 percent of Binding's stock, he finally agreed to take 40 percent. On April 26, 1955, at the first meeting of Binding's board of directors, Blissert was elected president of the company, Brook vice-president, and Blissert's wife, Virginia, was elected secretary and treasurer. A total of 60 shares of stock in Binding was then issued. *248 Twenty-four shares, or 40 percent, of the stock went to Blissert and Virginia, for which Blissert paid $12,000. Brook subscribed for the remaining 36 shares, or 60 percent, of Binding's stock for which he paid $18,000. Brook retained 9 shares, or one-quarter of the stock, subscribed for by him, and gave the remaining stock in equal amounts to three trusts established by him for each of his children, who at that time were minors. On April 27, 1955, Brook entered into an agreement with Binding whereby he purportedly transferred to it the new franchise. This agreement between Brook and Binding provided, in pertinent part, as follows: Whereas by agreement dated August 2, 1944, the Seller [Brook] acquired from [Manufacturing] * * * an exclusive license and franchise to manufacture, assemble, and sell Wire-O products in greater New York for the life of said agreement, * * * and Whereas a supplemental agreement was entered into on April 11th, 1955 between [Manufacturing] * * * and the Seller [Brook] detailing the term of the said August 2, 1944 agreement and specifying that said term was to end on June 9, 1970, and formally extending the said agreement so as to cover such products *249 as Mult-O and Flex-O, as well as any other such products which [Manufacturing] shall develop, and Whereas the Purchaser [Binding] desires to acquire from the Seller [Brook] all of his rights under the said agreement of August 2, 1944, and the supplemental agreement of April 11, 1955, and the Seller [Brook] has consented to the sale and assignment of all of his rights under such agreements IT IS THEREFORE, AGREED AS FOLLOWS: 1. The Seller [Brook] hereby sells, assigns and transfers to the Purchaser [Binding], as of May 1, 1955, all of his right, title, and interest under said agreement of August 2, 1944 and under the supplemental agreement of April 11, 1955, and does absolutely assign the said contracts to the Purchaser [Binding], as of said date. 2. The purchaser [Binding] hereby purchases all of the Seller's [Brook's] rights under the said agreements and agrees to pay therefor the sum of $600,000, to be paid at the rate of $40,000 per year in quarterly payments of $10,000 each, on the first days of February, May, August, and November of each year, commencing on August 1, 1955 and ending on May 1, 1970. Brook and Blissert conducted arm'slength negotiations *250 concerning the amounts to be paid by Binding with regard to the new franchise. Their method of valuation was based upon a projection of earnings that the new franchise would be likely to generate during its 15-year life. They based this projection upon an average of the proprietorship's earnings for the preceding three years. During the years 1952 through 1954, the proprietorship earned $24,669, $36,494, and $55,240, respectively, or an average of approximately $40,000 per year. Blissert believed that he would be able to cause 351 Binding to earn substantially more than $40,000 per year and that Binding was therefore purchasing the new franchise at a bargain price. The agreement of April 11, 1955, made a significant change in the agreement of August 2, 1944. For the first time, the franchisee held the written right to sell Mult-O, Cushion-Edge and machinery, and Flex-O. The agreement also provided for termination of the franchise on June 9, 1970. The agreement of April 11, 1955, did not create any new rights as to the type of franchise. Thus, the agreement did not create an exclusive right to sell in the Greater New York area nor the right to manufacture in such area. Both prior *251 to and after April 11, 1955, franchisees located outside the Greater New York area have been selling in Greater New York. Pursuant to an agreement dated April 28, 1955, Binding agreed to assume the machinery rental agreement under which Brook was lessee. Binding also assumed Brook's lease covering the premises occupied by the proprietorship in New York City. Pursuant to the same agreement, Brook transferred to Binding all tangible assets of the proprietorship. The agreement of April 28, 1955, was independent of the agreement dated April 27, 1955. No portion of the $600,000 paid pursuant to the April 27, 1955, contract was for assets acquired under the contract of April 28, 1955. Opinion The parties have raised a preliminary question as to which party has the burden of proof in the present proceeding. The notice of deficiency stated that the $40,000 received by Brook was dividend income. [1] The original answer of the Commissioner alleged that the notice of deficiency was correct and requested that the deficiency set forth therein be sustained in all respects. This Court filed its original opinion on Octtober 30, 1964. We held that Brook's sale of the franchise resulted in short-term *252 capital gain rather than dividend income. We entered our decision on February 17, 1965. On December 30, 1964, the Commissioner moved by ex parte motion to amend his answer. The Commissioner stated in his motion that it was necessary to amend respondent's pleadings to conform with the Court's holding that the sale of the franchise resulted in short-term capital gain rather than dividend income. On May 5, 1965, Brook filed his petition for review by the Court of Appeals for the Second Circuit. Brook contends that the issue presently before this Court as to long- or short-term gain is clearly new matter pleaded in the answer. Accordingly, under Rule 32 of this Court [2] respondent *253 should have the burden of proof on the issues hereinafter considered. Brook's argument is not convincing. The purpose of Rule 32 is to transfer the burden of proof to respondent when he injects a new theory into the case and that new theory results in an increased deficiency. Rozelle McSpadden, 50 T.C. 478, 493 (1968). In the case at bar respondent has not caused any surprise to Brook. Respondent did not amend his answer prior to the trial before this Court. Respondent's amendment occurred only after this Court had rendered its opinion. The amendment to the answer merely conformed the pleadings to our opinion prior to entry of the decision. Moreover, the increased deficiency resulted solely from disallowing a dividend received credit - a mechanical adjustment required by our opinion. On April 27, 1955, Brook sold to Binding his contractual rights under franchise agreements dated August 2, 1944, and April 11, 1955. The total consideration was *254 $600,000. The parties did not allocate the $600,000 between the two franchise agreements. All of the $600,000 was taxable gain. The Court of Appeals for the Second Circuit has remanded the instant case to this Court for an allocation of gain between the two franchise agreements. We must treat only that gain attributable to the 1944 contract as from property held for more than six months. We read the opinion of the Second Circuit to suggest that we first determine the value of the 1955 contract. The balance of the total purchase price ($600,000) will be the value of the 1944 contract. 352 The Second Circuit fragmentized the 1944 and 1955 contracts into their component parts. The Court of Appeals agreed with Brook's contention that the 1955 contract created significant new rights, left some others untouched, and neither replaced nor terminated the 1944 contract. It suggested that arguable differences between the two contracts include duration, products covered, and type of franchise. Pursuant to the opinion of the Second Circuit, we have compared the 1944 and 1955 contracts as to their differences. The first difference to be considered relates to the products covered. The *255 Second Circuit stated that it was unclear from the 1944 contract whether it covered Mult-O and Flex-O, as well as Wire-O, while the 1955 contract clearly covered all three. After the Second Circuit's opinion, Brook now contends that the 1944 contract did cover Mult-O and Flex-O, as well as Wire-O. Since the 1955 contract also covered only these same products, the 1955 contract created no additional rights with respect to products covered. We have concluded that the 1944 franchise contract covered agreements. We must treat only that gain attributable to the 1944 contract as from property held for more than six months. We read the opinion of the Second Circuit to suggest that we first determine the value of the 1955 contract. The balance of the total purchase price ($600,000) will be the value of the 1944 contract. The Second Circuit fragmentized the 1944 and 1955 contracts into their component parts. The Court of Appeals agreed with Brook's contention that the 1955 contract created significant new rights, left some others untouched, and neither replaced nor terminated the 1944 contract. It suggested that arguable differences between the two contracts include duration, products *256 covered, and type of franchise. Pursuant to the opinion of the Second Circuit, we have compared the 1944 and 1955 contracts as to their differences. The first difference to be considered relates to the products covered. The Second Circuit stated that it was unclear from the 1944 contract whether it covered Mult-O and Flex-O, as well as Wire-O, while the 1955 contract clearly covered all three. After the Second Circuit's opinion, Brook now contends that the 1944 contract did cover Mult-O and Flex-O, as well as Wire-O. Since the 1955 contract also covered only these same products, the 1955 contract created no additional rights with respect to products covered. We have concluded that the 1944 franchise contract covered only Wire-O binding. Other products such as Flex-O, Mult-O, and Cushion-Edge and machinery were not added to Brook's franchise until the 1955 contract. The 1944 contract stated: "That the patentee hereto grants to the licensee the rights to assemble and sell Wire-O products." Arthur Brook admitted upon cross-examination at the trial on remand that the 1944 contract constituted merely a reduction to writing of his franchise which was originally granted orally in 1935. *257 He further testified that Mult-O did not come into existence until 1939. Thus, the 1935 oral contract could not have embraced Mult-O. In addition, the taxpayers have not presented any convincing evidence that the 1935 contract was intended to include Cushion-Edge or Flex-O products. On the other hand, the 1955 contract stated that the 1944 agreement "is hereby formally extended to cover such products as Mult-O and Flex-O as well as any other such products which Wire-O Corporation shall develop." This language, together with the foregoing evidence, compels the Court to conclude that the 1955 contract created new rights by extending the franchise to include Mult-O, Flex-O, and Cushion-Edge products. With respect to type of franchise, the Second Circuit declared: The third difference between the two contracts was in the type of franchise. The 1944 contract granted rights to assemble and sell, with no restriction as to geographical area. It also recited that the patentee would not license any other concern to manufacture or assemble in Greater New York, without the licensee's consent. Brook's right to assemble was exclusive, but his right to sell was not. The 1955 agreement said, *258 erroneously, that the 1944 agreement gave Brook an exclusive franchise to manufacture, assemble, and sell in Greater New York. We assume, but do not decide, that the 1955 contract did at least create such rights. In the next paragraph of the opinion it is stated: [The] 1955 contract, for instance, leaves untouched the licensee's non-exclusive right to assemble and sell outside Greater New York. Furthermore, the alteration 353 in the duration of the contract, the creation of a right to manufacture in Greater New York, and the making of the preexisting right to sell exclusive in Greater New York, all amount to a contract which is consistent with the old contract. The new contract adds to the old; it does not replace it. Notwithstanding the Second Circuit's assumptions in the latter paragraph that the 1955 contract created a right to manufacture in Greater New York and made the preexisting right to sell exclusive in Greater New York, we have taken literally the Court of Appeals' statement that it has left undecided whether or not the 1955 contract created such rights. We are convinced by the overwhelming evidence presented at the trial following remand that the 1955 contract *259 did not create such rights. Regarding the right to sell in Greater New York, the two paragraphs of the 1955 contract which set forth the actual agreements of the parties make no reference to a right to sell. In the 1955 agreement, which was drawn by an attorney, a "Whereas" clause erroneously recited, as the Court of Appeals stated (360 F. 2d 1011, 1014), that the August 2, 1944, agreement gave Brook an exclusive franchise to manufacture, assemble, and sell Wire-O products in Greater New York. We agree with Brook's contention that such recital in the 1955 contract of the existence in the 1944 contract of an exclusive right to sell was a scrivener's error. The sales patterns of the franchisees confirm the conclusion that Brook's right to sell in Greater New York was not exclusive. Both before and after April 11, 1955, the franchisees located outside the Greater New York area have been selling inside the Greater New York area. For example, General Offset Printing, Inc., located in Springfield, Massachusetts, sells Wire-O products in New York. We therefore conclude that Brook's right to sell in Greater New York, before and after the 1955 contract, has been nonexclusive. *260 The 1955 contract made no changes regarding Brook's rights to sell. As noted above, the Second Circuit raised the question whether the 1955 contract created a right to manufacture in Greater New York. We have concluded that the attorney who drafted the 1955 contract committed an error. He incorrectly recited that the 1944 contract granted an exclusive right to manufacture. Whatever rights Brook may have acquired to manufacture did not arise from the 1955 contract. Respondent has not advanced any argument to the contrary. With respect to duration of the franchise, the Second Circuit stated: [It] is not disputed that the 1955 contract was to end in 1970. The Tax Court held, and petitioners now urge, although for a different reason, that the 1944 contract was for an indefinite term, because the duration depended on the expiration date of both patents and improvement patents. This would be true if the word "improvements" on page 1 of the contract was a patent "mentioned or referred to on page 1 of this contract," a construction on which we express no opinion. On remand the parties and the Tax Court may freely reexamine this question. For the reasons explained in our prior decision *261 (T. C. Memo. 1964-285 at 288 footnote 9), we reassert our finding that the franchise orally granted Brook in 1935, and reduced to writing with the agreement of August 2, 1944, was unlimited in duration. The 1955 contract provided for the termination of the franchise on June 9, 1970. Clearly, Brook was not given any additional rights by the 1955 contract with respect to duration of the franchise. If anything, the 1955 contract curtailed his rights as to duration. In retrospect, we conclude that the 1955 contract added to the franchise such products as Mult-O, Flex-O, and Cushion-Edge. The 1955 contract did not add any rights with respect to duration or type of franchise. We further conclude that the 1955 contract created only those rights described hereinabove. This Court must now determine what part of the gain realized by Brook is attributable to the 1955 contract rather than to the 1944 contract. Only that gain attributable to the 1944 contract is to be treated as gain from property held for more than six months. The burden is on Brook to produce evidence from which a proper determination can be made. Fred Draper, 32 T.C. 545 (1959); Paul v. Commissioner, 206 F. 2d 763 *262 (C.A. 3, 1953), vacating and remanding on other grounds 18 T.C. 601 (1952). Since the only additional rights arising from the 1955 contract were as to products covered, we allocate the gain realized according to the profit contribution of the products covered by the contracts of August 2, 1944, and April 11, 1955. 354 The evidence presented by Brook regarding the allocation has not been satisfactory. In fact, the only evidence produced on his behalf at the more recent trial was the following testimony of Robert Blissert, managing officer of Binding: Q: Now, Mr. Blissert, with regard to the net profit percentage wise that Wire-O Binding Company makes or made, rather, in the period 1952 to April, 1955, could you state what the relative percentages of profit were on Wire-O binding as contrasted to Mult-O, Flex-O and et cetera? * * * A: Practically impossible to give you a direct answer to that, but I would assume it's about fifty, fifty, fifty per cent profit on the Wire-O work we did, and about fifty per cent on the Mult-O covers, machinery we sold. On the other hand, respondent has submitted an allocation based on the proportion that the various products contributed *263 to the proprietorship's gross profit for the three years prior to the sale of the business in 1955. Respondent's computations are based upon profit and loss statements submitted by Brook with his income tax returns for 1952, 1953, and 1954. Respondent's allocation is as follows: Gross profit breakdown per profit and loss statements attached to the joint tax returns of Arthur F. Brook and Ruth T. Brook: Year
Wire-O
Covers,Mult-O. etc.
Wire-OEquipment
Total
1952
$25,215.51
$ 40,278.38
$ 460.00
$ 65,953.89
1953
6,851.13
79,893.02
3,694.03
90,438.18
1954 (6,433.81)
123,137.82
36.50
116,740.51
Totals
$25,632.83
$243,309.22
$4,190.53
$273,132.58
3-year average
8,544.28
81,103.07
1,396.84
91,044.19
Average Percentage
9.4
89.1
1.5
100 Respondent concludes that 9.4 percent of the $600,000, or $56,400, should be attributed to the sale of Brook's rights under the 1944 contract. The other 90.6 percent of the $600,000, or $543,600, should be attributed to the April 11, 1955, contract. Brook disputes the accuracy of respondent's computations. He contends on brief that the net profit totals are distorted. His explanation is that as *264 a matter of convenience on the profit and loss statements he deducted operating expenses only from Wire-O. Brook did not apportion for federal income tax purposes the operating expenses among the products. In making our own allocation on this unsatisfactory record, nevertheless, we have done our best to give proper consideration to Brook's contention. We conclude that 20 percent of the $600,000, or $120,000, should be attributed to the sale of Brook's rights under the 1944 contract. The balance of $480,000 should be attributed to the April 11, 1955, contract. The Court of Appeals for the Second Circuit has further ordered: It is necessary, on the question raised by the Commissioner's cross-petition, whether the contracts in the hands of the corporation are depreciable, to remand also, for if the 1944 contract is held to have expired in 1956, depreciation in 1957, the year at issue here, must be calculated only from that part of the corporation's basis for the contracts allocated to the 1955 contract. [360 F. 2d at 1014-1015] Respondent had argued on brief before the Second Circuit "The 1944 agreement does not have a limited life because its life would be extended *265 by any improvement patents obtained." As noted above, we now hold upon remand that the duration of the franchise under the 1944 contract was originally for the life of the six patents and of any improvements thereto. The 1955 contract, however, curtailed the unlimited duration of the franchise. It provided for the franchise to terminate in 1970. Accordingly, we conclude that Binding is entitled to a depreciation deduction in 1957. Decisions will be entered under Rule 50. 355 Footnotes
1. At the initial trial before this Court on January 16 and 17, 1964, respondent expounded his theory. Briefly stated, Brook transferred to Binding on April 27, 1955, his rights acquired under contracts of August 2, 1944, and April 11, 1955. Binding agreed to pay $600,000 in installments over a 15-year period. It was respondent's position that Brook's transfer of his contractual rights were in the nature of a capital contribution. Binding's installment payments of the $600,000 to Brook were dividend income.↩
2. RULE 32. BURDEN OF PROOF The burden of proof shall be upon the petitioner, except as otherwise provided by statute, and except that in respect of any new matter pleaded in his answer, it shall be upon the respondent.↩